**CITY OF NEW HAVEN, CONNECTI-CUT, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Eastern Air Lines, Inc., Allegheny Airlines, Inc., Intervenors.**

**No. 153, Docket 79–4100.**

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1979.

Decided March 3, 1980.

Robert M. Beckman, Washington, D. C. (Frederick W. Danforth, Deputy Corporation Counsel, City of New Haven, Conn., on brief), for petitioner.

Glen M. Bendixsen, Associate Gen. Counsel, Civil Aeronautics Bd., Washington, D. C. (John R. Shenefield, Asst. Atty. Gen., Robert R. Nicholson, Daniel J. Conway, Attys., Dept. of Justice, Washington, D. C., Philip J. Bakes, Jr., Gen. Counsel, Gary J. Edles, Deputy Gen. Counsel, Alan R. Demby, Thomas L. Ray, David E. Bass, Attys., Civil Aeronautics Bd., Washington, D. C., on brief), for respondent.

Before GURFEIN,* VAN GRAAFEILAND and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

In 1978, after four decades in which the domestic air transportation industry was subject to comprehensive economic regulation by the Civil Aeronautics Board (the "Board" or "CAB"), Congress passed the "Airline Deregulation Act" (the "Deregulation Act" or "1978 amendments"), amending the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et seq.* (1976), (the "Act"). The Deregulation Act was designed "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services . . .." P.L. 95–504, 92 Stat. 1705, 1705 (1978). Effective October 24, 1978, the Deregulation Act substantially altered the Board's role in regulating such matters as airline fares and routes.

In December 1978, relying on provisions of the Deregulation Act, Eastern Air Lines and the Allegheny Airlines gave notices that 90 days hence they would terminate their service at New Haven, Connecticut. The City of New Haven sought unsuccessfully to have the Board order Eastern and Allegheny to continue providing such service. The Board determined (Order No. 79–3–98, dated March 15, 1979 (hereinafter "March order")) that as a result of the Deregulation Act, prior restraints on unilateral termination of service by an airline had been substantially removed and that an airline could terminate service at a community merely by giving 90 days' notice of its intent to do so, provided that it did not thereby deprive that community of "essential air transportation." The Board found, pursuant to § 419(a)(10) of the Deregulation Act, that in light of other air service currently offered at New Haven, the proposed suspensions did not "reasonably appear[ ] to deprive" New Haven of "essential air transportation."

New Haven has petitioned this Court to review the CAB order refusing to prohibit Eastern and Allegheny from terminating service to New Haven. It challenges the substantive determinations of the March order and the procedures used by the Board. Finding none of New Haven's arguments persuasive, we deny the petition.

I.  *Background of the Deregulation Act*

From 1938, when the first comprehensive statute governing regulation of civil aviation was passed,[1] until 1978, the domestic air transportation industry was subject to stringent control by the CAB. The principal airlines—i. e., major airlines, or "trunk" carriers, such as United Air Lines, American Airlines, and Eastern, and regional airlines, or "local service" carriers, such as Allegheny, Ozark Air Lines and Hughes Airwest—operated pursuant to certificates of "public convenience and necessity." The Board could permit a certificated carrier to enter a new market only if the carrier showed that the service it proposed was "required" by the public convenience and necessity. Market exit was similarly restricted. Under § 401(g), a carrier's certificate could be amended to permit the carrier to terminate service at a given point upon a showing that the amendment was required by the public convenience and necessity.[2]

---

* Judge Gurfein died on December 16, 1979. This case has been decided by the two remaining members of the panel pursuant to § 0.14(b) of the Rules of the United States Court of Appeals for the Second Circuit.

1. The regulatory scheme established by the Civil Aeronautics Act of 1938, Pub.L. No. 706, 52 Stat. 973, was subsequently modified in significant respects by the Federal Aviation Act of 1958, Pub.L. No. 726, 72 Stat. 754.

2. Section 401(g), 49 U.S.C. § 1371(g) (1976), provided in relevant part:

> The Board upon petition or complaint or upon its own initiative, after notice and hearings, may alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require, or may revoke any such certificate, in whole or in part, for intentional failure to comply with any provision of this subchapter or any order, rule, or regulation issued hereunder or any term, condition, or limitation of such certificate: *Provided,* That no such certificate shall be revoked unless the holder thereof fails to comply, within a reasonable time to be fixed by the Board, with an order of the

Alternatively, § 401(j) provided that a carrier could "abandon" a route or part thereof upon showing that the abandonment was required by the public interest.[3] Finally, in the markets they were serving, the carriers were required by § 404(a)(1) to provide "safe and adequate service."[4]

The Deregulation Act was designed to phase out government regulation of the industry, while protecting, by federal subsidy if necessary, smaller communities from such withdrawals of services as would result in their loss of "essential air transportation."[5] Section 419(a) of the Deregulation Act required the CAB to determine by October 24, 1979, what constituted "essential air transportation" for each community served by no more than one certificated air carrier;[6] the

Board commanding obedience to the provision, or to the order (other than an order issued in accordance with this proviso), rule, regulation, term, condition, or limitation found by the Board to have been violated. Any interested person may file with the Board a protest or memorandum in support of or in opposition to the alteration, amendment, modification, suspension, or revocation of the certificate.

3. Section 401(j), 49 U.S.C. § 1371(j) (1976), provided:

No air carrier shall abandon any route, or part thereof, for which a certificate has been issued by the Board, unless, upon the application of such air carrier, after notice and hearing, the Board shall find such abandonment to be in the public interest. Any interested person may file with the Board a protest or memorandum of opposition to or in support of any such abandonment. The Board may, by regulations or otherwise, authorize such temporary suspension of service as may be in the public interest.

4. Section 404(a)(1), 49 U.S.C.A. § 1374(a)(1) (Cum.Supp.1979), provides:

It shall be the duty of every air carrier to provide and furnish interstate and overseas air transportation, as authorized by its certificate upon reasonable request therefor and to provide reasonable through service in such air transportation in connection with other air carriers authorized to engage in scheduled air transportation by certificate or by exemption under section 1386(b)(3) of this title [§ 416(b)(3) of the Act]; to provide safe and adequate service, equipment, and facilities in connection with such transportation; to establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges, and just and reasonable classifications, rules, regulations, and practices relating to such air transportation; and, in case of such joint rates, fares, and charges, to establish just, reasonable, and equitable divisions thereof as between air carriers participating therein which shall not unduly prefer or prejudice any of such participating air carriers.

5. "Essential air transportation" is defined in § 419(f), 49 U.S.C.A. § 1389(f) (Cum.Supp. 1979), which provides:

For purposes of this section, the term "essential air transportation" means scheduled air transportation of persons to a point provided under such criteria as the Board determines satisfies the needs of the community concerned for air transportation to one or more communities of interest and insures access to the Nation's air transportation system, at rates, fares, and charges which are not unjust, unreasonable, unjustly discriminatory, unduly preferential, or unduly prejudicial, and—

(1) with respect to air transportation to any point (other than in the State of Alaska), in no case shall essential air transportation be specified as fewer than two daily round trips, 5 days per week, or the level of service provided by air carriers to such point based on the schedules of such air carriers in effect for calendar year 1977, whichever is less

. . . .

6. Section 419(a), 49 U.S.C.A. § 1389(a) (Cum. Supp.1979), provides, in relevant part:

(1) For purposes of this subsection, the term "eligible point" means any point in the United States to which, on October 24, 1978, any air carrier—

(A) is providing service pursuant to a certificate issued to such carrier under section 1371 of this title [§ 401 of the Act]; or

(B) is authorized pursuant to such certificate to provide such service, but such service is suspended on October 24, 1978.

(2)(A) With respect to each eligible point which on October 24, 1978 is served by not more than one air carrier holding a certificate issued under section 1371 of this title [§ 401 of the Act], not later than the last day of the one-year period beginning on October 24, 1978, the Board, after considering the views of any interested community and the State agency of the State in which such community is located, shall determine what is essential air transportation for such point.

\* \* \* \* \* \*

(C) The Board shall periodically review the determination of what is essential air transportation to each eligible point, and may, based upon such review and consultations with any interested community and the State agency of the State in which such community is located,

make appropriate adjustments as to what is essential air transportation to such point.

(3) No air carrier shall terminate, suspend, or reduce air transportation to any eligible point below the level of essential air transportation established by the Board under paragraph (2) unless such air carrier—

(A) If such air carrier—

(i) holds a certificate issued under section 1371 of this title [§ 401 of the Act], or

(ii) does not hold such a certificate, but is receiving compensation pursuant to paragraph (5) of this subsection for service to such eligible point,

has given the Board, the appropriate State agency or agencies, and the communities affected at least ninety days notice prior to such termination, suspension, or reduction; and

(B) If such air carrier does not hold such a certificate and is not receiving compensation pursuant to paragraph (5) of this subsection for service to such eligible point, has given the Board, the appropriate State agency or agencies, and the communities affected at least thirty days notice prior to such termination, suspension, or reduction.

(4) Whenever the Board determines that essential air transportation will not be provided to any eligible point without compensation—

(A) the Board shall provide notice that applications may be submitted by any air carrier which is willing to provide essential air transportation to such point for compensation under this subsection. In selecting an applicant to provide essential air transportation to such point for compensation the Board shall, among other factors, specifically consider—

(i) the desirability of developing an integrated linear system of air transportation whenever such a system most adequately meets the air transportation needs of the communities involved;

(ii) the experience of the applicant in providing scheduled air service in the vicinity of the communities for which essential air transportation is proposed to be provided; and

(iii) notwithstanding the provisions of clause (ii), with respect to any eligible point in the State of Alaska, the experience of an applicant in providing scheduled air service, or significant patterns of nonscheduled air service pursuant to an exemption granted pursuant to section 1386 of this title [§ 416 of the Act], in Alaska; and

(B) the Board shall establish in accordance with the guidelines promulgated under subsection (d) of this section, a rate of compensation to be paid for providing such essential air transportation.

(5) The Board shall make payments of compensation under this subsection at times and in a manner determined by the Board to be appropriate. The Board shall continue to pay compensation to any air carrier to provide essential

air transportation to any eligible point only for so long as the Board determines it is necessary in order to maintain essential air transportation to such eligible point.

(6) Notwithstanding section 1371(j) of this title [§ 401(j) of the Act], if an air carrier has provided notice to the Board under paragraph (3) of such air carrier's intention to suspend, terminate, or reduce service to any eligible point below the level of essential air transportation to such point, and if at the conclusion of the applicable period of notice the Board has not been able to find another air carrier to provide essential air transportation to such point, the Board shall require the carrier which provided such notice to continue such service to such point for an additional 30-day period, or until another air carrier has begun to provide essential air transportation to such point, whichever first occurs. If at the end of such 30-day period the Board determines that no other air carrier can be secured to provide essential air transportation to such eligible point on a continuing basis, either with or without compensation, then the Board shall extend such requirement for such additional 30-day periods (making the same determination at the end of each such period) as may be necessary to continue air transportation to such eligible point until an air carrier can be secured to provide essential air transportation to such eligible point on a continuing basis.

(7)(A) If any air carrier (i) which is providing air transportation to any eligible point, and (ii) which is receiving compensation under this subsection or under section 1376 of this title [§ 406 of the Act] for providing such air transportation to such point, is required by the Board to continue service to such point beyond the date on which such air carrier would, but for paragraph (6) of this subsection, be able to suspend, terminate, or reduce service to such point below the level of essential air transportation to such point, then after such date such air carrier shall continue to receive such compensation until the Board finds another air carrier to provide essential air transportation to such point.

(B) If the Board requires an air carrier which holds a certificate issued under section 1371 of this title [§ 401 of the Act] and which is providing air transportation to any eligible point without compensation pursuant to paragraph (5) of this subsection or section 1376 of this title [§ 406 of the Act] to continue to provide essential air transportation to such point beyond the 90-day notice period after which, but for paragraph (6) of this subsection, such air carrier would be able to suspend, terminate, or reduce service to such point below essential air transportation for such point, then the Board shall compensate such air carrier for any losses that the air carrier incurs in complying with this subparagraph after the last day of such 90-day period, except that the Board shall not make any payments under this subparagraph, to any

Deregulation Act established as the minimum that could be determined by the Board, two daily round-trips five days per week, or the carrier schedules for 1977, whichever was less.

The Deregulation Act substantially reduced barriers to entry of airlines into new markets, by, *inter alia*, allowing automatic entry in some circumstances, and replacing the former standard that the public interest "require" a service, with a more liberal policy under which the CAB must allow entry if it is not shown to be inconsistent with the public convenience and necessity. *See, e. g.,* § 401(d)(1)(A), 49 U.S.C.A. § 1371(d)(1)(A) (Cum.Supp.1979). With respect to exit from a given market, § 401(j), dealing with abandonment of routes by the carrier, was replaced by a new provision which forbids a carrier to terminate all service to a point unless it has provided 90 days' notice to the Board and to the concerned state and local authorities.[7] Section 401(g), which permits certificate amendments upon a showing of public convenience and necessity, was not substantively changed.[8]

trunk air carrier for service to such point after the last day of the one-year period beginning on the date on which any payment is made to such air carrier under this subparagraph for service to such point.

(C) If the Board requires an air carrier which does not hold a certificate issued under section 1371 of this title [§ 401 of the Act], but which is providing air transportation to any eligible point without compensation pursuant to paragraph (5) of this subsection or section 1376 of this title [§ 406 of the Act] to continue to provide essential air transportation to such point beyond the 30-day notice period after which, but for paragraph (6) of this subsection, such air carrier would be able to suspend, terminate, or reduce service to such point below essential air transportation for such point, then the Board shall compensate such air carrier for any losses that such air carrier incurs in complying with this paragraph after the last day of such 30-day period.

(9) During any period for which the Board requires any air carrier to continue providing air transportation to an eligible point which such air carrier has proposed to terminate, reduce, or suspend, the Board shall continue to make every effort to secure an air carrier to provide at least essential air transportation to such eligible point, on a continuing basis.

(10) Unless the Board has determined what is essential air transportation for any eligible point pursuant to paragraph (2) of this subsection, the Board shall, upon petition of any appropriate representative of such point, prohibit any termination, suspension, or reduction of air transportation which reasonably appears to deprive such point of essential air transportation, until the Board has completed such determination.

\* \* \* \* \* \*

7. Section 401(j), 49 U.S.C.A. § 1371(j) (Cum. Supp.1979), provides:

(1) No air carrier holding a certificate issued under this section shall—

(A) terminate or suspend all air transportation which it is providing to a point under such certificate; or

(B) reduce any such air transportation below that which the Board has determined to be essential air transportation for such point; unless such air carrier has first given the Board, any community affected, and the State agency of the State in which such community is located, at least 90 days notice of its intent to so terminate, suspend, or reduce such air transportation. The Board may, by regulation or otherwise, authorize such temporary suspension of service as may be in the public interest.

(2) If an air carrier holding a certificate issued pursuant to this section proposes to terminate or suspend nonstop or single-plane air transportation between two points being provided by such air carrier under such certificate, and such air carrier is the only air carrier certificated pursuant to this section providing nonstop or single-plane air transportation between such points, at least sixty days before such proposed termination or suspension, such air carrier shall file with the Board and serve upon each community to be directly affected notice of such termination or suspension.

8. Section 401(g), 49 U.S.C.A. § 1371(g) (Cum. Supp.1979), provides:

The Board upon petition or complaint or upon its own initiative, after notice and hearings or pursuant to the simplified procedures under subsection (p) of this section, may alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require, or may revoke any such certificate, in whole or in part, for intentional failure to comply with any provision of this subchapter or any order, rule, or regulation issued hereunder or any term, condition, or limitation of such certificate: *Provided,* That no such certificate shall be revoked unless the holder thereof fails to comply, within a reasonable time to be fixed by the Board, with an order of the Board commanding obedience to the provision, or to the order (other than an order issued in accordance with this proviso), rule, regulation, term, condition, or limitation

## II. *The Present Controversy*

Eastern Air Lines was certificated to provide air service to New Haven in 1946. Eastern formerly offered service between New Haven and Boston, Baltimore, Atlanta, and Jacksonville and Pensacola, Florida. In 1974, however, the Board granted Eastern authority to suspend service for a five-year period ending March 22, 1979. On December 21, 1978, Eastern filed notice with the Board "pursuant to § 401(j)(1)" of the Act that it intended "to suspend all service at New Haven" on March 22, 1979.[9] The proposed 1979 suspension would not have caused a reduction in actual service; rather, it would have relieved Eastern of the obligation to resume service at New Haven.

Allegheny Airlines was certificated to serve New Haven in 1959. At one time Allegheny offered service from New Haven to Boston and Washington. By 1978, however, Allegheny was providing service only between New Haven and Harrisburg, Pennsylvania, via New York, to the extent of two round-trip flights on weekdays and one round-trip flight a day on weekends, using 25-seat aircraft. On December 29, 1978, Allegheny filed a notice "under Sections 401(j)(1), 401(j)(2) and 419(a)(3)" of the Act that it intended to suspend all service at New Haven as of March 29, 1979.

When they filed their notices of intent to suspend service, Eastern and Allegheny were the only carriers certificated by the Board to provide air service at New Haven. Several non-certificated commuter airlines were also providing such service, however. Pilgrim Aviation and Airlines, Inc., ("Pilgrim"), using 19-seat aircraft, offered ten or more nonstop flights per weekday in each direction between New Haven and New York and six or more nonstop flights per day in each direction on weekends. Pilgrim also provided four round-trips each weekday and one round-trip per day on weekends between New Haven and Boston, and offered additional service between New Haven and New London, Connecticut. In addition, Business Aircraft Corporation and New Haven Airways, using six- and eight-seat aircraft, offered weekday flights to Albany, White Plains, and Islip, New York, Hartford and Bridgeport, Connecticut, Philadelphia and Baltimore.

On March 8, 1979 the Board announced that it would consider the notices of suspension filed by Eastern and Allegheny at a public meeting on March 15. On March 12 the City of New Haven, the New Haven Board of Airport Commissioners and the New Haven Economic Development Commission petitioned the Board to prohibit the proposed suspensions of service. The New Haven parties contended first, that §§ 401(g) and 404(a) of the Act prohibit carriers from suspending service merely on notice, and that prior Board approval upon a showing of "public convenience and necessity" is required; and second, they contended that § 419(a)(10) of the Act required the Board to block the instant suspensions because they would deprive New Haven of "essential air transportation."

The Board received the submissions of the New Haven parties but did not hold a hearing. In its March order, the Board rejected both of New Haven's positions. On the question of suspension of service on notice, the Board stated that it was "not persuaded" by New Haven's argument, but deferred "detailed" consideration of the

---

found by the Board to have been violated. Any interested person may file with the Board a protest or memorandum in support of or in opposition to the alteration, amendment, modification, suspension, or revocation of the certificate.

The 1978 amendments merely added a reference to the simplified procedures authorized by the new § 401(p).

**9.** The notice specified that Eastern intended "to suspend all service at New Haven, Connecticut,

under its certificate of public convenience and necessity for Route 6." New Haven points out that Eastern was certificated to serve New Haven on its Route 5 as well as on its Route 6. We agree with the Board (which attributed the omission "to clerical error or mere oversight") that Eastern's "clear purpose [was] to withdraw all of its service from New Haven." Order No. 79–3–98 at 4 (Mar. 15, 1979).

question until its decision in another pending case.[10] The Board simply asserted:

> For now it is sufficient to observe that the New Haven Parties (1) ignore the central change in section 401(j) of the new Act—the elimination of the requirement of prior Board approval before a carrier may "abandon any route, or part thereof"; and (2) ignore the legislative history of the Senate version of the new termination/suspension provision (the primary predecessor of the final bill), which clearly indicates that the Senate intended to give carriers the flexibility to withdraw from points without our permission if they provide the necessary notice and their withdrawal does not affect "essential air transportation."
>
> Moreover, our interpretation of the Act—that notice and the essential air transportation obligations are the only prerequisites to suspending at a point—is more clearly in harmony with the Congressional policy favoring maximum reliance on market forces and on actual and potential competition to provide needed transportation.

On New Haven's second point, the Board concluded that it was not required to block the suspensions of service at New Haven under § 419(a)(10), because it found that these suspensions would not deprive New Haven of "essential air transportation." In making this determination, the Board relied principally on the service being provided by Pilgrim, finding that Pilgrim was "fit, willing and able to provide essential air transportation" and that Pilgrim met the safety requirements of the Federal Aviation Administration. The Board concluded:

We believe the level of air service being provided at New Haven by Pilgrim reasonably appears to meet the essential air transportation requirements of New Haven. This, as supplemented by the service of Business Aircraft and New Haven Airways, affords New Haven passengers access to points throughout the nation. In addition, we note that the level of service provided by Pilgrim is substantially above the legal minimum for essential air transportation defined in section 419(f)(1) of the Act.

Thus, the Board entered the March order declining to block the proposed suspensions of service, and Eastern and Allegheny suspended service as planned in March, 1979. Currently, the only service in and out of New Haven is that provided by the commuter airlines. Following the March suspensions, New Haven filed this petition for review, which was argued on October 3, 1979.

On October 24, 1979, the Board issued Order No. 79–10–134, in which it made its determination, pursuant to § 419(a)(2)(A) of the Act, of what constitutes "essential air transportation" for New Haven. The level set by the Board as "essential" is significantly below the level of service currently provided to New Haven by the commuter airlines serving it. The correctness of the October determination is not involved in this petition, although the Board contends that the fact of that determination moots New Haven's petition for review of the March order.

### III. Method of Terminating Service

New Haven's first substantive contention[11] is that the Act prohibits a

---

10. The reference was to the petition filed by the Commonwealth of Puerto Rico for reconsideration of the Board's decision in *Northeast Points—Puerto Rico/Virgin Islands Service Investigation*, Order No. 78–12–105 (Dec. 14, 1978). In its Order on Reconsideration, Order No. 79–9–178 (Sept. 17, 1979), the Board adhered to its view that § 401(j) of the Act, as modified by the 1978 amendments, permits a carrier to suspend service at a point upon giving 90 days' notice of its intent to do so.

11. We find no merit in New Haven's contentions that the Board's procedures denied due process. We note at the outset that New Haven was not entitled to a full hearing in this case. Section 401(j) makes no provision whatever for a hearing. Under § 419(a)(10), New Haven had the right to petition the Board; but since that provision does not require a hearing, New Haven was not entitled to one. *See Nebraska Dep't of Aeronautics v. C. A. B.*, 298 F.2d 286, 291–93 (8th Cir. 1962), and *Springfield Airport Authority v. C. A. B.*, 109 U.S.App. D.C. 197, 285 F.2d 277 (D.C.Cir.1960) (discuss-

carrier from suspending service to a certificated point unless it has obtained Board approval upon a showing that "public convenience and necessity" required the suspension. It argues that the airlines could not suspend service merely by giving notice under § 401(j)(1), but were required to seek a certificate amendment under § 401(g), deleting their authority to serve New Haven.[12] The question is whether the 1978 amendments—and specifically, the amendment to § 401(j)—altered the substantive requirements of the Act with respect to service suspensions. The Board concluded that the 1978 amendments did effect such a change, and for the reasons that follow, we agree.

Prior to the 1978 amendments, a carrier could be relieved of its obligation to serve a certificated point in one of three ways. First, § 401(g)[13] authorized the Board, either on the filing of a petition or on its own initiative, to suspend or terminate a carrier's authority at a point by amending its certificate, if the Board found the amendment to be required by "the public convenience and necessity." Second, § 401(j)[14] permitted a carrier to abandon a route for which it was certificated if, upon the carrier's application, the Board found the abandonment to be "in the public interest." Finally, the last sentence of § 401(j) permitted the Board, "by regulations or otherwise, [to] authorize such temporary suspension of service as may be in the public interest."

Thus, before the 1978 amendments, a carrier could permanently halt service to a certificated point only upon prior Board approval. And as to any certificated point, § 404(a)(1) required a carrier "to provide . . . safe and adequate service."[15]

The 1978 amendments did not alter § 404(a)(1), nor did they materially change

---

ing temporary suspensions under § 401(j)). The structure of § 419(a), and the fact that § 419(a)(10) determinations must (in light of our construction of § 401(j)(1)) be made within 90 days, indicate that Congress intended the Board to make § 419(a)(10) determinations quickly and informally. A hearing requirement would directly contradict this clear Congressional design.

New Haven challenges the role played by the Board's staff in the decisional process in this case, arguing that the staff was its only "opponent," and that New Haven was not afforded an opportunity to rebut the staff's presentations to the Board. We think this argument misapprehends the nature of the administrative process, and the relationship of the courts to that process. We would be most reluctant to undertake an examination of the Board's internal workings. See United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941); Montrose Chemical Corp. v. Train, 160 U.S.App.D.C. 270, 275–278, 491 F.2d 63, 68–71 (D.C.Cir.1974). Fortunately, there is no need to do so, because New Haven has not demonstrated that it was prejudiced by the staff's activities. The Board has released copies of the staff memoranda and draft orders presented to it in this case (Joint appendix at 19–27, 85–89), and New Haven has not pointed to any factual inaccuracies in these presentations. And of course, New Haven is not entitled to have the staff agree with its legal positions. We can only conclude that New Haven was not prejudiced by, and is therefore not entitled to complain of, the manner in which the Board obtained assistance from the staff.

Finally, New Haven challenges the propriety of certain communications between the staff and the Federal Aviation Administration and various agencies of the State of Connecticut. The staff contacted those agencies in the course of gathering information relevant to this case. New Haven charges that these were unlawful ex parte communications. As the Board points out, however, these communications were not in violation of the Board's ex parte rule. See 14 C.F.R. § 300.2(c)(8), as amended by PR–192, 44 Fed.Reg. 4655 (Jan. 23, 1979). Nor does New Haven assign any other reason why these communications might have been improper.

12. This claim obviously is not mooted by the Board's October determination pursuant to § 419(a)(2)(A), whether or not the latter is eventually upheld, that the service in question was not "essential air transportation": if New Haven's construction of the statute were correct and the Board found that the "public convenience and necessity" did not require the amendment deleting the airlines' authority, the airlines would be required to continue providing service.

13. See note 2, supra.

14. See note 3, supra.

15. Section 404(a)(1) is set out in its entirety at note 4 supra.

§ 401(g).[16] The termination provision of old § 401(j), however, was replaced in its entirety. The new § 401(j)(1)[17] provides that a certificated carrier shall not terminate or suspend all service to a point "unless such air carrier has first given the Board [and the concerned local authorities] at least 90 days notice of its intent to so terminate [or] suspend" service. The final sentence of § 401(j)(1), like the final sentence of the old § 401(j), provides that the Board may authorize temporary suspensions of service by regulation or otherwise.

In the Board's view, the enactment of new § 401(j)(1) provided a new means by which a carrier may be permanently relieved of service obligations: the carrier may suspend service simply by giving 90 days' notice of its intent to do so. New Haven points out that the language of new § 401(j)(1), read literally, does not directly authorize suspensions on notice, but rather bars a carrier from suspending service *unless* it has given notice. It argues that the amendment to § 401(j) merely imposed an additional notice requirement on carriers seeking permission to suspend service in § 401(g) proceedings. New Haven's construction of § 401(j)(1), however, cannot be reconciled with other provisions added by the 1978 amendments, and it is inconsistent with the legislative history.

The clearest indication in the statute that Congress intended the amended § 401(j)(1) to authorize suspensions on notice is found in §§ 419(a)(6) and (a)(7), which were also added to the Act by the 1978 amendments. Section 419(a)(6) provides that "[n]otwithstanding section 401(j)," if a carrier serves notice of its intent to reduce service to a

point below the "essential air transportation" level, and if the Board does not find a replacement carrier within the notice period, the Board shall "require" the original carrier to continue service for additional 30-day periods. Section 419(a)(7) provides that where the Board requires a carrier to continue service "beyond the date on which such air carrier would, but for paragraph (6) of this subsection, be able to suspend . . . service to such point," the Board must compensate the carrier for any resulting losses. These provisions clearly contemplate that 90 days after a carrier serves notice under § 401(j)(1), the suspension will go into effect unless the Board prevents it; and the touchstone as to whether or not the Board should prevent it is the "essential air transportation" level, not the "public convenience and necessity."

New Haven nonetheless contends that a construction of § 401(j)(1) to permit suspension on notice is inconsistent with § 401(g), taken alone or in conjunction with § 404(a)(1). It argues that Congress evidenced its intention that § 401(g) retain its vitality by amending the section merely to include reference to simplified procedures and leaving it otherwise unchanged. New Haven contends that the Board's construction of § 401(j)(1) renders § 401(g) meaningless. This is hardly so, however, since § 401(g) remains the only means by which a carrier can be eliminated from a market at the instigation of the Board or third parties.[18]

As to § 404(a)(1), which requires that a carrier provide safe and adequate service at any place for which it is certificated,[19] New

---

**16.** *Compare* notes 2 *and* 8, *supra.*

**17.** *See* note 7, *supra.*

**18.** New Haven also argues that Part 205 of the Board's regulations, 14 C.F.R. Part 205 (1978), *required various proceedings before the carriers' notices of suspension could become effective.* These regulations were obviously made obsolete by the 1978 amendments, and the Board has revoked them. 44 Fed.Reg. 20635 (April 6, 1979). Of course, even if the Board had left these regulations on the books, they could not have overridden the Congressional

decision to permit airlines to suspend service on notice.

**19.** The Board argues that the § 404(a)(1) duty to provide adequate service has in fact proven unenforceable, but New Haven notes that it has been enforced in the past, *see Capital Air Lines, Inc. v. C. A. B.,* 108 U.S.App.D.C. 215, 281 F.2d 48 (D.C.Cir.1960); *see also Delta-Northeast Merger Case,* 59 C.A.B. 608, 610, 624–25 (1972), and we note that Congress apparently assumed the enforceability of such a duty at the time of the 1978 amendments. *See*

Haven points out that Congress provided that § 404(a)(1) would cease to be effective on December 31, 1981, and argues that the section continues in full force and effect until that date.[20] Thus, the argument goes, Eastern and Allegheny must provide service to New Haven as long as they are certificated for New Haven, and their certificates can be amended only pursuant to § 401(g). While this argument may have some technical appeal, we do not believe it is persuasive or that our rejection of it eviscerates § 404(a)(1). The Board's construction of § 401(j)(1) does not give a carrier complete freedom to evade its § 404(a)(1) obligation to provide service; the carrier must still wait at least 90 days until its notice of suspension becomes effective, and there are circumstances in which suspension could be delayed indefinitely (see Part IV A, infra ). In any event, we believe New Haven's § 404(a)(1) argument must yield to the clear indications in §§ 419(a)(6) and (7), described above, that Congress intended § 401(j)(1) to allow termination of service on notice.[21]

Our conclusion is reenforced by a reading of the legislative history. The new § 401(j)(1) was put into its final form by the Conference Committee. The section as enacted, however, is in large part the same as § 401(h)(1) passed by the Senate in S.2493,

95th Cong., 2d Sess. (1978). See H.R.Rep. No.1779, 95th Cong., 2d Sess. 61, 67 (1978) (Conference Report).[22] Section 401(h)(1) of the Senate bill, like § 401(j)(1) as enacted, was framed in negative terms as prohibiting suspensions unless the carrier has given notice, rather than as an explicit affirmative authorization of suspensions on notice. The sponsor of S. 2493, Senator Cannon, clearly expected his bill to permit suspension of service on notice, absent Board action to block the suspension:

> Under sections 401 and 419, exit is permitted after notice of 90 days, unless the carrier is the last one serving the community in which case extensions are required if no replacement carrier has been found.

124 Cong.Rec. S5850 (daily ed. Apr. 19, 1978) (remarks of Sen. Cannon). The Senate Report reflects the same understanding:

> While carriers certificated under this section [401] will be permitted to exit communities under the notice requirements provided[,] if the carrier's termination will result in the communities' "essential" air transportation needs being unmet, the Board will require the carrier to continue service until a replacement carrier is found.

§ 1601(a)(1)(F), 49 U.S.C.A. § 1551(a)(1)(F) (Cum.Supp.1979).

**20.** Section 1601(a)(1)(F), 49 U.S.C.A. § 1551(a)(1)(F) (Cum.Supp.1979), provides that § 404(a), "insofar as that section requires any air carrier to provide air transportation authorized by its certificate," shall cease to be in effect on December 31, 1981.

**21.** For the same reason we conclude that the recitals of the carriers' service obligations which appear in the carriers' certificates must be deemed modified by the 1978 amendments.

**22.** Section 401(h)(1) of the Senate bill provided in relevant part as follows:

> Except as provided in paragraphs (2) and (3), no air carrier, holding a certificate issued under this section, shall—
> (A) terminate or suspend air transportation which it is required to provide to a point under such certificate; or
> (B) reduce any such air transportation below that which the Board has determined to be essential air transportation for that point;

> unless such air carrier has first given the Board, the community affected, and the State agency of the State in which such community is located, at least 90 days notice of its intent to so terminate, suspend, or reduce such air transportation. If the carrier proposing to so terminate or suspend air transportation is the only air carrier certificated under this section providing scheduled air transportation to the point involved, or, if the air carrier proposing to reduce air transportation is the only air carrier certificated under this section providing essential air transportation to the point involved, then the Board may require such air carrier to continue providing such air transportation for an additional 90-day period.

The last-quoted sentence resembles the provision in the enacted § 419(a)(6) under which the Board can require a carrier to continue serving a point even after the carrier has served notice of its intent to suspend service under § 401(j).

S.Rep.No.631, 95th Cong., 2d Sess. 61 (1978). These explanations persuasively support the Board's construction of § 401(j)(1).

New Haven relies on a comment by Representative Anderson, to the effect that the House version of the 1978 amendments, H.R. 12611, 95th Cong., 2d Sess. (1978), would not affect the Act's requirement that a carrier obtain prior Board approval before terminating all service to a point. 124 Cong.Rec. H10320 (daily ed. Sept. 21, 1978). The pertinence of Representative Anderson's comment, however, is diminished by the fact that H.R. 12611 did not provide any modification of the old § 401(j). See H.R. Rep.No.1211, 95th Cong., 2d Sess. 49 (1978) U.S.Code Cong. & Admin.News 1978, p. 3737. The Conference Committee followed the Senate bill on this point, replacing the old § 401(j) with a version which resembled § 401(h)(1) of the Senate bill. See H.R.Rep. No.1779, supra at 61, 67. Thus Representative Anderson's comments were not directed to the provision finally enacted, and do not affect our reading of the new § 401(j)(1).

Finally, we note that the Board's construction of § 401(j)(1) is more closely attuned to the Congressional concern, in passing the 1978 amendments, with promoting free competition in the airline industry, see S.Rep.No.631, supra at 5–6; H.R.Rep.No. 1211, supra at 3–4, and with "[t]he placement of maximum reliance on competitive market forces and on actual and potential competition . . . to provide the needed air transportation system." § 102(a)(4), 49 U.S.C.A. § 1302(a)(4) (Cum.Supp.1979). The effectiveness of freer entry, as a means of fostering competition, would be substantially undercut by a construction of § 401(j)(1) which did not allow correspondingly free exit from markets.

■ Thus, we agree with the Board that the new § 401(j)(1) conditionally permits a carrier to suspend service to a point upon giving 90 days' notice of its intent to do so.

Allegheny and Eastern were entitled to suspend service at New Haven, unless the suspensions "reasonably appear[ed] to deprive" New Haven of "essential air transportation." § 419(a)(10).

### IV. The March Determination as to Essential Air Transportation

New Haven's second substantive claim is that the Board should have blocked these suspensions in March 1979 under § 419(a)(10) because they deprived New Haven of "essential air transportation." The Board contends that the March order is now moot and was, in any event, correct.

### A. Mootness of the March Order

■ The Board argues that its "interim" determination of "essential air transportation" under 419(a)(10) has been superseded by the "final" determination of "essential air transportation" under § 419(a)(2)(A), and that as a result, nothing turns on the correctness of the former order. We disagree. Since the Board's § 419(a)(2)(A) determination of "essential air transportation" for New Haven was made after the Eastern and Allegheny suspensions, we conclude that a successful challenge to the § 419(a)(10) determination (in the event that New Haven also prevails on its challenge to the § 419(a)(2)(A) determination) could result in a practical benefit to New Haven—arising from the operation of other provisions of § 419(a)—that would not be available from a successful challenge to the § 419(a)(2)(A) determination alone.[23]

The relevant elements of the § 419(a) "guaranteed essential air transportation" program, designed to protect small communities from service reductions following the introduction of free competition to the airline industry, are as follows. The program applies to all points which a certificated carrier was serving or was authorized to serve on the date of enactment, October 24, 1978. § 419(a)(1). Within one year after

---

**23.** While it appears that no party has yet petitioned for review of Order No. 79–10–134, which contains this determination, there is a request pending for an extension of time to file a petition. It thus appears that the October determination for New Haven pursuant to § 419(a)(2)(A) is still subject to review.

enactment—*i. e.*, by October 24, 1979—the Board was required to "determine what is essential air transportation" for points, such as New Haven, which were being served by no more than one certificated carrier on the enactment date. § 419(a)(2)(A). During this one-year interim period, the Board, upon receiving notice of a carrier's intent to suspend service, was required to prohibit any service reduction "which reasonably appears to deprive such point of essential air transportation, until the Board has completed [the § 419(a)(2)(A)] determination." § 419(a)(10).[24] As noted above, New Haven's substantive claim rests upon this last provision.

Once the Board has made its § 419(a)(2)(A) determination, other provisions governing service reductions may come into play. If a carrier wishes to effect a reduction or termination of service that will have the effect of reducing service below the level set by the Board as "essential," the carrier must give 90 days' notice pursuant to § 419(a)(3)(A).[25] If by the end of the 90-day notice period the Board has not found another carrier to provide service at the level deemed "essential," the Board must require the carrier that gave notice to continue serving the point for successive 30-day periods until the Board finds a substitute carrier. § 419(a)(6). While the carrier is being compelled to provide service beyond the notice period, the Board must compensate it for resulting losses, § 419(a)(7)(B), and "shall continue to make every effort to secure" a substitute carrier. § 419(a)(9).

Apart from these obligations which arise when the Board is notified of proposed service reductions, the Board is required, whenever it determines that "essential air transportation" will not be provided to a point without compensation, to seek and entertain applications to provide such service for compensation. § 419(a)(4). However, nothing in § 419(a) authorizes the Board to compel a carrier that is not serving a point to commence service to that point.

It is clear from the provisions of § 419(a), therefore, that assuming that the airlines' terminations would be found under § 419(a)(2)(A) to deprive New Haven of essential air transportation, New Haven has a very definite stake in obtaining a reversal of the § 419(a)(10) determination involved in the present case: such a reversal would invalidate the suspensions by Eastern and Allegheny, and require them to resume service; the carriers could very well file new notices of their intent to suspend service, but at that point the Board would be required, under § 419(a)(6), to search for a replacement carrier and to block the suspensions for successive 30-day periods until it found a replacement.

If, on the other hand, the Board's § 419(a)(10) determination were allowed to stand (or is bypassed as moot), Eastern and Allegheny would not have to resume service to New Haven. Then, even if their withdrawals were found, under § 419(a)(2)(A), to deprive New Haven of essential air transportation, the Board would be required merely to seek applicants to provide New Haven service for compensation, under § 419(a)(4). The Board could not compel any carrier to provide this service, and until a new carrier was found, New Haven would be without essential air transportation.

Since a reversal of the § 419(a)(10) determination could affect the level of service at

---

**24.** Section 419(a)(10), 49 U.S.C.A. § 1389(a)(10) (Cum.Supp.1979), provides:

Unless the Board has determined what is essential air transportation for any eligible point pursuant to paragraph (2) of this subsection, the Board shall, upon petition of any appropriate representative of such point, prohibit any termination, suspension, or reduction of air transportation which reasonably appears to deprive such point of essential air transportation, until the Board has completed such determination.

**25.** Section 419(a)(3)(A) thus overlaps § 401(j)(1)(B), which also requires the carrier to provide notice of a proposed service reduction when its effect is to lower service below the essential air transportation level. We have determined above that § 401(j)(1) affirmatively authorizes carriers to suspend service on notice. We do not address the question whether § 419(a)(3)(A), which is framed in terms similar to those of § 401(j)(1), might also operate as a substantive grant of authority to carriers to suspend service on notice.

New Haven, we find that New Haven's petition for review of the March order under § 419(a)(10) is not moot.

## B. The Determination of Essential Air Transportation

In challenging the Board's § 419(a)(10) determination, New Haven argues that the Board misanalyzed the issues and misconstrued the statute. We reject both contentions, and therefore uphold the Board's action.

New Haven first argues that the Board did not analyze the "essential air transportation" question as required by the statute. Relying on the language of § 419(f),[26] New Haven argues that the Board failed to consider whether the service offered by the commuter airlines would satisfy New Haven's "needs" for transportation "to one or more communities of interest" and would "insure[ ] access to the Nation's air transportation system" at fair prices. It is true that the Board, in its order, did not specifically undertake to define New Haven's "needs," or its "communities of interest," or what would constitute fair prices. But the Board did explicitly find that "the level of air service being provided at New Haven by Pilgrim reasonably appears to meet the essential air transportation requirements of New Haven," Order No. 79–3–98 at 5, and that Pilgrim's service "is substantially above the legal minimum for essential air transportation defined in section 419(f)(1)." _Id._ In our view, therefore, although the Board did not use the precise words of § 419(f), it made the finding required by § 419(a)(10) that the noticed terminations did not "reasonably

[appear] to deprive [New Haven] of essential air transportation." [27]

New Haven also appears to be arguing that the Board's interpretation of "essential air transportation" is unduly narrow. It is clear that New Haven's view of what constitutes "essential air transportation" is substantially more expansive than that adopted by the Board. Thus, New Haven asserts that the Board should have investigated, in this proceeding, New Haven's "needs" for service to a number of midwestern cities to which New Haven has never had service.[28] The Board, on the other hand, concluded that the present service to New York and Boston was more than sufficient to meet the "essential air transportation" test. The Board's more modest view of "essential air transportation" seems more in line with Congressional expectations, see, e. g., 124 Cong.Rec. S5850 (daily ed. Apr. 19, 1978) (remarks of Sen. Cannon), and in any event is entitled to our deference. See C.A.B. v. Carefree Travel, Inc., 513 F.2d 375, 390 (2d Cir. 1975). However, there is no need for this Court precisely to delineate the scope of "essential air transportation" in this case. The only question before us is whether we should uphold the Board's determination that the instant suspensions did not "_reasonably appear_" to deprive New Haven of "essential air transportation." Congress committed this determination to the Board, in the first instance, and clearly contemplated that the Board would act quickly and informally, on the basis of its expertise; accordingly, judicial review of the Board's determination must be a limited one. Cf. S.E.C. v. New England Elec. System, 390 U.S. 207, 211, 88 S.Ct. 916, 920, 19 L.Ed.2d 1042 (1968). It is

---

26. _See_ note 5, _supra._

27. New Haven also argues that the reference to § 419(a)(3)(A) in Allegheny's notice of intent to suspend service constituted a concession that Allegheny's suspension would reduce service to New Haven below the "essential air transportation" level. Of course, § 419(a)(3)(A), by its terms, did not apply to the suspensions in this case—that section only covers suspensions proposed _after_ the Board makes its § 419(a)(2)(A) determination of "essential air transportation," and the suspensions in this case occurred before the Board had made that

determination. More to the point, even if Allegheny believed that its suspension deprived New Haven of "essential air transportation," its view of the matter could not bind the Board.

28. In making these assertions, New Haven ignores the language of § 419(a)(10). The focus of this proceeding is not on what service New Haven might like to have, or even what service it might need; rather, we are concerned with the much narrower question of whether the suspensions at issue in this case "deprived" New Haven of "essential" service.

sufficient to conclude, as we do, that the Board did not act in an arbitrary or capricious manner,[29] *Rombough v. F.A.A.,* 594 F.2d 893, 896–97 (2d Cir. 1979); *Tiger Int'l, Inc. v. C.A.B.,* 554 F.2d 926, 935–37 (9th Cir. 1977), *cert. denied,* 434 U.S. 975, 98 S.Ct. 532, 54 L.Ed.2d 467 (1978), in determining that these suspensions did not "reasonably appear" to deprive New Haven of "essential air transportation."

The petition is denied.

---

**29.** We find no merit in the contention that the Board acted arbitrarily because its determination with respect to New Haven did not attempt to distinguish allegedly "inconsistent" determinations in thirteen other cases, in which the Board did block attempted suspensions pursuant to § 419(a)(10). We do not believe the Board's prior conclusions can fairly be characterized as inconsistent with the Board's determination here. In eight of the cases referred to, the carrier that gave notice of intent to suspend service was the only carrier providing service at the point. Orders 79–2–103, 79–3–16, 79–4–127, 79–5–21, 79–5–26, 79–5–138, 79–5–140 and 79–6–95. In the other cases, the level of service provided by the remaining carriers was much lower than that provided to New Haven by Pilgrim alone. Orders 79–2–46, 79–2–126, 79–5–22, 79–5–25 and 79–2–12.