**FRONTIER AIRLINES, Petitioner,**

v.

**CIVIL AERONAUTICS
BOARD, Respondent.**

No. 83–2163.

United States Court of Appeals,
Tenth Circuit.

June 7, 1985.

Joseph B. Goldman, Baker & Hostetler, Washington, D.C. (Lee H. Simowitz, Baker & Hostetler, Washington, D.C., James E. Hautzinger, Sherman & Howard, Denver, Colo., and David N. Brictson, Vice President-General Counsel, Frontier Airlines, Inc., Denver, Colo., with him on briefs), for petitioner.

Thomas L. Ray, Acting Associate Gen. Counsel, C.A.B., Washington, D.C. (J. Stephen Britt, Gen. Counsel, C.A.B., Washington, D.C., J. Paul McGrath, Asst. Atty. Gen., Barry B. Grossman and George Edelstein, U.S. Dept. of Justice, Washington, D.C., with him on brief), for respondent.

Before BARRETT and McWILLIAMS, Circuit Judges, and KERR,* District Judge.

BARRETT, Circuit Judge.

Frontier Airlines, Inc. (Frontier), petitions this Court pursuant to the Adminis-

---

* The Honorable Ewing T. Kerr, Senior United States District Court Judge for the District of Wyoming, sitting by designation.

trative Procedure Act, 5 U.S.C. § 701, *et seq.*, for review of two orders[1] of the Civil Aeronautics Board (the "Board") that seek recapture of tax allowances paid by the Board to Frontier in 1979 and 1980. We have jurisdiction to review these orders under 49 U.S.C. § 1486. We conclude that the Board's orders were consistent with its actual tax policy[2] implementing § 406 of the Federal Aviation Act of 1958 and therefore were neither arbitrary nor capricious.

The issue in this appeal is whether the Board acted consistent with its actual tax policy in ordering Frontier to refund to the Board tax allowances accompanying subsidy payments made to Frontier for the years 1979 and 1980. Although the facts are not in dispute, the parties disagree as to what facts are relevant for purposes of our review. While we agree with Frontier that additional subsidies paid to Frontier for a nineteen month period between 1969 and 1971 are irrelevant for purposes of determining whether the Board's attempted recapture of tax allowances paid in 1979 and 1980 is consistent with its actual tax policy, we review the facts here to set in perspective the positions of both the Board and Frontier with respect to the effect of the subsidy paid to Frontier for the 1969 to 1971 period on the present dispute.

From 1969 to 1971 Frontier received subsidies for providing air service to potentially unprofitable communities based on class, rather than individual, rates. These class rates were based on the average financial needs of carriers within the class. Believing that it was entitled to subsidies based on an individual (higher) rate, Frontier filed with the Board an individual rate petition. In Order 79–4–171 (April 26, 1979), the Board denied Frontier's petition. Thereafter Frontier petitioned this Court for re-view of that order. Upon review of the petition we determined that Frontier was entitled to an individual rate; the case was then remanded to the Board with directions to recompute the subsidies due Frontier for this period based on an individual rate. *Frontier Airlines, Inc. v. C.A.B.*, 629 F.2d 643 (10th Cir.1980).

Upon remand, the Board determined that Frontier was entitled to an additional $1.8 million subsidy for the 1969–1971 period. Because this $1.8 million payment would constitute income in the year of receipt (1982), however, the Board provided pursuant to its actual tax policy a $1.6 million tax allowance to cover the additional tax burden resulting from the subsidy payment. This tax allowance was paid to Frontier on the condition that if Frontier's actual Federal or State income tax for 1982 subsequently was determined to have been greater or less than $1.6 million, the tax allowance would be adjusted accordingly.

The Board later discovered that Frontier would actually incur no income taxes for the year 1982. Citing its previous order regarding the adjustment of the $1.6 million tax allowance, the Board issued an Order to Show Cause to Frontier why it should not be required to reimburse the Board the amount of the tax allowance. Order 83–3–57 (March 9, 1983). Frontier responded that it proposed to carry back its 1982 losses to the years 1979, 1980, and 1981.[3] To require that Frontier remit to the Board the $1.6 million tax allowance for 1982, argued Frontier, would be in effect to reduce Frontier's refunds for the years to which Frontier sought to carry back its 1982 losses. According to Frontier, the Board's tentative decision in this regard was contrary to the Board's actual tax policy. The Board agreed that recapture of

---

**1.** Orders 83–5–145 (May 27, 1983) and 83–8–52 (August 10, 1983).

**2.** The Board's actual tax policy is delineated in § III(H)(3) of Class Rate IX of the Board's regulations, providing that "[i]f an actual ... tax return disclosing no tax liability is filed by any carrier for which a tax allowance is provided by this order or subsequent orders, the Board will require the refund of all taxes paid to the carri-er for the period covered by the return, and for subsequent periods." Order 79–10–51 (October 9, 1979, at 11).

**3.** The amount of the refund of taxes paid for 1981 as a result of the 1982 loss carrybacks had not yet been determined when the Board sought recapture of the 1979 and 1980 tax allowances; the recapture of 1981 tax allowances is therefore not before us.

the $1.6 million tax allowance was contrary to its actual tax policy. *See Transatlantic Final Mail-Rate Case, Reopened,* 42 C.A.B. 195 (1965). However, the Board believed that Frontier's argument should be taken to its logical conclusion: if the Board could not recapture the tax allowance paid to Frontier in 1982 for the 1969–1971 period, it should be able to recapture the tax allowances paid to Frontier in 1979 and 1980 because "it would ... exceed [Frontier's] need to both provide it with a tax element as part of its Class Rate IX subsidy and allow it to enjoy the benefits of a refund of the taxes thus subsidized, without [Frontier] passing the refund back to the Board." Order 83–5–145 (May 27, 1983), at 3. The Board thus proposed to recapture tax allowances paid to Frontier in 1979 and 1980.

Frontier objected to the Board's attempted recapture of the 1979 and 1980 tax allowances. Frontier argued to the Board, and now argues on this review, that recapture of these tax allowances was improper in light of changes Congress had effected in the § 406 subsidy program itself. Whereas it received subsidy in 1979 and 1980 according to its need,[4] argued Frontier, the need standard no longer applied in 1982 and thereafter. Rather, from January 1 to September 30, 1982, subsidy was limited to points (cities) enplaning fewer than eighty passengers per day. Pub.L. No. 97–102, 95 Stat. 1455, 1456. This, according to Frontier, resulted in Frontier's receipt of subsidy for only half of its § 406 points; the system therefore was not based on "need." Frontier further points to the appropriation acts for fiscal 1983, which, it contends, terminated any authority the Board had to administer the § 406 program. According to Frontier, even if the 1983 appropriations acts terminated only Frontier's authority to pay out moneys, the termination of this authority constitutes a

"watershed" within the meaning of *Allegheny Airlines, Inc. v. C.A.B.,* 465 F.2d 778 (4th Cir.1972), therefore rendering the Board's attempted recapture of tax allowances paid in 1979 and 1980 arbitrary and capricious. Finally, Frontier contends that the Board's attempted recapture of the 1979 and 1980 tax allowances conflicts with Congress' purpose in creating a one-year transitional subsidy program during fiscal 1983, after the § 406 subsidy program had been eliminated.

### DISCUSSION

Frontier challenges the Board's authority to order recapture of the 1979 and 1980 tax allowances, reasoning that the fiscal 1983 appropriations acts terminated any authority the Board had to act under § 406. Neither the plain language of the appropriations acts for fiscal 1983 nor any of the legislative history, however, supports Frontier's position. In our view, the language of the appropriations acts and legislative history supports the opposite contention: that only the Board's authority to *pay* subsidies after September 30, 1982, was terminated. The Continuing Appropriations Resolution for Fiscal Year 1983 stated that "notwithstanding any other provision of law, none of the *funds* hereafter appropriated by this joint resolution or any other Act shall be expended under section 406 (49 U.S.C. 1376) for services provided after September 30, 1982." Pub.L. No. 97–276, 96 Stat. 1197 (emphasis added). The Department of Transportation and Related Agencies Appropriations Act for fiscal 1983 contained the identical language. Pub.L. 97–369, 96 Stat. 1778. Furthermore, while the committee reports consistently state that the appropriations legislation "terminates the section 406 program," *see, e.g.,* S.Rep. No. 567, 97th Cong., 2d Sess. 82 (1982); H.R.Rep. No. 960, 97th Cong., 2d Sess. 20 (1982), it is clear that taken in

---

**4.** Section 406(b) provided that subsidy was to be based on "the need of [the carrier] ... for compensation for the transportation of mail sufficient to insure the performance of such service, and together with all other revenue of the air carrier, to enable such carrier under honest,

economical and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service and the national defense." 49 U.S.C. § 1376.

context, these statements refer to the continuing subsidization of air service, not to the Board's authority to resolve past controversies.[5] Inasmuch as the plain language of the appropriations acts refers only to termination of the Board's authority to *pay* future subsidies, Frontier's argument is one of repeal by implication. The Supreme Court has said on many occasions that repeals by implication are not favored, especially when the purported repealing measure is contained, as here, in an appropriations measure. *See, e.g., United States v. Will,* 449 U.S. 200, 221–222, 101 S.Ct. 471, 483–484, 66 L.Ed.2d 392 (1980). We decline to find such a repeal without a clear expression of legislative intent.

Frontier maintains that even if the Board's authority to resolve the present dispute was not terminated by the fiscal 1983 appropriation acts, still the Board is without power to order recapture of the 1979 and 1980 tax allowances because a "watershed" separates those years and the losses it suffered in 1982 (and determined in 1983 to carry back). Frontier's argument, however, is based upon a narrow reading of the holding in *Allegheny Airlines, supra.*

*Allegheny Airlines* involved a change in the Board's method of subsidy recapture. Until 1967, in determining the propriety of recapture for a particular year, the governing principle was recomputation of profits after taxes and recoupment of excessive profits. This principle was known as "profit sharing." Beginning in 1967, however, profit sharing as a method of subsidy recapture was replaced by passenger revenue growth sharing. The theory was that increases in passenger revenues would be reflected in increased profits; the new rule therefore provided for a reduction in subsidy in an amount equal to fifteen percent of the increase in passenger revenues in the subsidy year over those in a base period.

The theory, however, proved unfounded. Although carriers operating under the new system had net profits in 1965 and 1966, they suffered increasing losses in 1967, 1968, and 1969, despite substantial increases in net passenger revenues. Because the Fourth Circuit determined that subsidy recapture was arbitrary and capricious under these circumstances, Frontier argues that *Allegheny Airlines* stands for the proposition that it is "arbitrary and unreasonable for the Board to order recapture of tax refunds after the fundamental basis of the subsidy system [has] been altered." Brief For Petitioner Frontier Airlines, Inc., at 31. Frontier maintains that this principle applies with redoubled force under circumstances where, as here, the payment of subsidies is not merely altered, but is terminated entirely.

Frontier's interpretation of *Allegheny Airlines* is correct as far as it goes. Although it is true that the change from profit sharing to passenger revenue sharing was essential to the Fourth Circuit's holding, equally essential thereto were the accounting principles under which the Board conducted the subsidy system. The Board's accounting system, which did not change when the subsidy system changed from profit sharing to passenger revenue sharing, provided that an item of income (consisting of tax refund money that resulted from a loss carry back) would be deemed to have accrued either in the earlier year (the tax year for which the refund was given) or in the later year (the tax year of loss), depending on whether the item of income was ascertainable for the earlier year at time of audit: if ascertainable at the time of audit, it was included in the earlier year; if not, it was included in the later year of receipt or accrual. This "rough justice," as it was referred to by the Fourth Circuit, was acceptable under the profit sharing method of subsidy recap-

---

**5.** We note also that Frontier's argument is inconsistent with the new procedure for judicial review of Board decisions in the Court of Claims established in the 1983 appropriations acts. *See* Pub.L. No. 97–369, § 322, 96 Stat. 1784. Indeed, pending before the Court of Claims is Frontier's challenge to the amount of subsidy provided to Frontier for the nineteen month period from 1969 to 1971 in response to this Court's determination that Frontier was entitled to an individual rate. *Frontier Airlines v. United States,* Claims Ct. No. 102–83C.

ture as long as the question was only *when* a carrier should be accountable for an item of income. An item of income not picked up in one year would be picked up in another. When the Board shifted to passenger revenue sharing as a method of subsidy recapture, however, the question was not simply when a carrier should be accountable for an item of income, but *whether* it would be accountable at all: if the item of income was not ascertainable at the time of audit, it would be deemed to have accrued in the later year when passenger revenue sharing was the operating principle and income was therefore irrelevant.

■ With this background, the facts of the present case are readily distinguishable. Even if we were to assume that a "watershed" separated the 1979 and 1980 tax allowances and the 1982 loss carrybacks, the fact remains that the system upon which the Board's attempted recapture was based consistently required the refund to the Board of tax allowances paid when it was later determined—by an amended tax return—that no tax liability in fact existed in the tax year for which the tax allowance was paid. The Board's authority to recapture tax allowances paid in 1979 and 1980 does not stem from some later agreement by which the Board agreed not to seek recapture of 1982 tax allowances; its authority stems from § III(H)(3) of Class Rate IX—the provision establishing the conditions upon which Frontier was provided tax allowances in 1979 and 1980.

In 1979 and 1980, the Board paid Frontier tax allowances on the condition that they be returned to the Board if Frontier later filed a tax return disclosing no tax liability for those years. Frontier filed such a return in 1983 when it sought to carry back its 1982 losses. Consistent with its actual tax policy, the Board then sought reimbursement from Frontier for the 1979 and 1980 tax allowances. We believe the Ninth Circuit had just such a scenario in mind when it remarked: "We would have no difficulty affirming an even-handed order directing all the local airlines with later tax losses to rebate appropriate amounts of

earlier subsidies." *Hughes Air Corporation v. C.A.B.*, 482 F.2d 143, 145 (9th Cir. 1973).

■ Finally, Frontier argues that requiring it to refund to the Board its 1979 and 1980 tax allowances effectively deprives it of 25% of the subsidy Congress intended it to receive under the one-year transitional subsidy program in 1982, which provided for continued payments, though at reduced levels, to carriers that had been receiving § 406 subsidies. The answer to Frontier's contention is that, as has already been determined herein, the 1979 and 1980 tax allowances can be recaptured by the Board pursuant to its actual tax policy. The use of this policy in a situation it was designed to reach in no way undermines Congress' later creation of a transitional program providing subsidy at reduced rates.

We direct enforcement of the Board orders.