**REPUBLIC AIRLINES, INC., and Ozark Air Lines, Inc.,
Petitioners,**

v.

**UNITED STATES DEPARTMENT OF TRANSPORTATION, Respondent.**

No. 85–1575.

United States Court of Appeals, Tenth Circuit.

June 15, 1988.

Raymond J. Rasenberger, Zuckert, Scoutt, Rasenberger & Johnson, Washington, D.C., (Thom G. Field, Neale, Newman, Bradshaw & Freeman, Springfield, Mo., and, Charles J. Simpson, Jr., Zuckert, Scoutt, Rasenberger & Johnson, Washington, D.C., with him on the briefs), for petitioners.

Thomas L. Ray, Sr. Trial Atty., U.S. Dept. of Transp., Washington, D.C. (Charles F. Rule, Acting Asst. Atty. Gen., Antitrust Div., Robert Nicholson and Laura

Heiser, U.S. Dept. of Justice, Washington, D.C., Rosalind A. Knapp, Deputy Gen. Counsel, Kenneth N. Weinstein, Deputy Asst. Gen. Counsel for Litigation, U.S. Dept. of Transp., Washington, D.C., with him on the briefs), for respondent.

Before SEYMOUR and ANDERSON, Circuit Judges, and BROWN *, District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

Republic Airlines, Inc. and Ozark Air Lines, Inc. (hereinafter the "Airlines") petition for review of an order of the Civil Aeronautics Board ("Board")[1] in which the Board refused to apply recaptured subsidy overpayments for the years 1978–82 to Republic and Ozark's "need" requirements under § 406(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1376(b) (the "Act") for fiscal years 1982 and 1983.

The central issue is whether the fiscal year 1982 and 1983 appropriations acts of Congress[2] substantively amended the local airline subsidy program established by section 406(b) of the Act, and curtailed the authority of the Board to pay subsidies after March 31, 1982, under Class Rate IX, promulgated by order of the Board pursuant to section 406(b).[3] Because we hold that the appropriations acts in question amended, and then terminated, the local airline subsidy program provided by section 406, and substantively limited the Board's power to pay subsidies, we affirm the Board's order.

I.

Section 406(a) of the Act authorized and directed the Board to fix "fair and reasonable rates of compensation for the transportation of mail by aircraft," and "to prescribe the method or methods ... for ascertaining such rates of compensation." Section 406(b) of the Act (hereafter section 406) further provided that in determining rates for various types or classes of air carriers, and different classes of service, the Board shall take into consideration, among other factors:

> "[T]he need of [the carrier] ... for compensation for the transportation of mail sufficient to insure performance of such service ... to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the United States Postal Service, and the national defense."

The "need" clause in section 406 provided the basis, among other things, for congressional subsidies to airlines serving the ofttimes unprofitable small community market. Republic and Ozark were among such local service airlines.[4] Their subsidy for the years in issue included a tax allowance component, meant to offset federal income taxes. Since taxes for the year could only be estimated at the time subsidies were paid, the governing rate order provided that if the airline's tax return showed no tax liability when filed, then the airline must refund the tax allowance

---

* Hon. Wesley E. Brown, Sr. Judge, U.S. District Court, Kansas, sitting by designation.

1. The powers of the Civil Aeronautics Board relating to air transportation were terminated or transferred to the Department of Transportation in 1985. Airline Deregulation Act of 1978, Pub.L. No. 95–504 § 40(a), 92 Stat. 1705, 1744 (1978) (codified as amended at 49 U.S.C. § 1551(b)).

2. Department of Transportation and Related Agencies Appropriations Act, 1982, Pub.L. No. 97–102, 95 Stat. 1442 (1981); Continuing Appropriations, Fiscal Year 1983, Pub. L. No. 97–276,

96 Stat. 1186 (1982); Department of Transportation and Related Agencies Appropriations Act, 1983, Pub. L. No. 97–369, 96 Stat. 1765 (1982) (referred to herein as the 1982 and 1983 appropriations acts, respectively).

3. *Order Fixing Final Subsidy Rate,* Order 79–10–51 (C.A.B. Oct. 9, 1979), R. at 193.

4. Subsequent to the filing of the petition in this case, Republic Airlines was acquired by NWA, Inc. and its operations were merged with those of Northwest Airlines, Inc. and Ozark Air Lines was acquired by Trans World Airlines and their operations were merged.

which it had previously received.[5] The money at issue in this case consists of such amounts, as follows:[6]

| Period | Ozark | Republic |
|---|---|---|
| 7/1/78–12/31/78 | — | $ 303 |
| 1/1/79–6/30/79 | $540,357 | 51,180 |
| 1/1/80–6/30/80 | — | 1,323,364 |
| 7/1/81–12/31/81 | 3,925 | — |
| 1/1/82–3/28/82 | 115,539 | — |
| 2/29/82–9/30/82 | 23,875 | — |
| TOTAL | $683,695 | $1,374,847 |

Order to Show Cause, Order 84–8–46 (C.A. B. Aug. 9, 1984), R. at 9, 11.

The Airlines do not contest the Board's actual tax policy requiring refunds of overpaid tax allowances, or the Board's general power to seek recoupment. We upheld those principles in *Frontier Airlines v. Civil Aeronautics Bd.*, 764 F.2d 735 (10th Cir.1985). Nor are the amounts of subsidies overpaid in the form of tax allowances for the years shown above contested. The Airlines contend that the 1982 and 1983 appropriations acts did not repeal or amend section 406, and the section 406 "need" standard continued in effect during those years; therefore, the Board was obligated to meet their subsidy needs in 1982 and 1983 notwithstanding reductions in appropriations. They also contend that in its order denying the requested relief, the Board violated its duty to address that legal issue and provide a satisfactory explanation of its action.

## II.

The pertinent portions of the two appropriations acts are as follows:

*For the balance of fiscal 1982 (April— Sept.):*

"[N]otwithstanding any other provision of law, none of the funds appropriated by this Act shall be expended under Section 406 for services provided after ninety-five days following the date of enactment of this Act to points which, based on reports filed with the Civil Aeronautics Board, enplaned an average of eighty or more passengers per day in the fiscal year ended September 30, 1981: *Provided further*, That notwithstanding any other provision of law, payments under Section 406, exclusive of payments for services provided within the State of Alaska, shall not exceed a total of $14,-000,000 for services provided during the period between March 31, 1982, and September 30, 1982, and, to the extent it is necessary to meet this limitation, the compensation otherwise payable by the Board under Section 406 shall be reduced by a percentage which is the same for all air carriers receiving such compensation . . ."

Department of Transportation and Related Agencies Appropriations Act, 1982, Pub.L. No. 97–102, 95 Stat. 1442 (1981).

*For fiscal 1983:*

"[N]otwithstanding any other provision of law, none of the funds hereafter appropriated by this or any other Act shall be expended under section 406 (49 U.S.C. 1376) for services provided after September 30, 1982: *Provided further*, That notwithstanding any other provision of law or of the previous provision of this paragraph, payments shall be made from funds appropriated herein and in accordance with the provisions of this paragraph to carriers providing, as of September 30, 1982, services covered by rates fixed under section 406 of the Federal Aviation Act (excluding services covered by payments under section 419(a)(7) . . .): *Provided further*, That notwithstanding any other provision of law, such payments shall be based upon rate orders applicable to such carriers as of July 1, 1982, but shall not exceed $13,-

---

**5.** "The Board's actual tax policy is delineated in § III(H)(3) of Class Rate IX of the Board's regulations, providing that '[i]f an actual ... tax return disclosing no tax liability is filed by any carrier for which a tax allowance is provided by this order or subsequent orders, the Board will require the refund of all taxes paid to the carrier for the period covered by the return, and for subsequent periods.' Order 79–10–51 (October 9, 1979), at 11." *Frontier Airlines v. Civil Aeronautics Bd.*, 764 F.2d 735, 736 n. 2 (10th Cir. 1985).

**6.** These amounts have been refunded pursuant to the Board's order "and, presumably, have been placed in the general fund of the treasury." Brief for Petitioners at 16.

500,000 in the aggregate: *Provided further,* That, notwithstanding any other provision of law, to the extent necessary to meet this limitation, such payments shall be reduced by a percentage which is the same for all carriers eligible for such payments...."

Continuing Appropriations, Fiscal Year 1983, Pub.L. No. 97–276, 96 Stat. 1197 (1982). The same language appears in the Department of Transportation and Related Agencies Appropriations Act, 1983, Pub.L. 97–369, 96 Stat. 1765 (1982).

The Airlines essentially concede that Congress intended to amend or repeal section 406(b) (and, therefore, any additional claim to a subsidy they might have), and adopt a special one year subsidy program, by the 1983 appropriations act. Brief for Petitioners at 12, 22; Reply Brief for Petitioners at 2. In *Frontier* we held that the 1983 appropriations legislation did not repeal the Board's authority to resolve past controversies. *Frontier,* 764 F.2d at 738. However, we also concluded that:

> *"the Board's authority to pay subsidies after September 30, 1982, was terminated.* The Continuing Appropriations Resolution for Fiscal Year 1983 stated that 'notwithstanding any other provision of law, none of the *funds* hereafter appropriated by this joint resolution or any other Act shall be expended under section 406 (49 U.S.C. 1376) for services provided after September 30, 1982.' Pub.L. No. 97–276, 96 Stat. 1197 (emphasis added). The Department of Transportation and Related Agencies Appropriations Act for fiscal 1983 contained the identical language. Pub.L. 97–396, 96 Stat. 1778. Furthermore, while the committee reports consistently state that the appropriations legislation 'terminates the section 406 program,' *see, e.g.,* S.Rep. No. 567, 97th Cong., 2d Sess. 82 (1982); H.R.Rep. No. 960, 97th Cong., 2d Sess.

20 (1982), it is clear that taken in context, *these statements refer to the continuing subsidization of air service,* not to the Board's authority to resolve past controversies.

*Id.* at 737–38 (footnote omitted) (emphasis added). In view of our prior consideration of the matter, and the Airlines' own obvious perception of the controlling statutory language and underlying expressions of congressional intent,[7] it is pointless to pursue the Airlines' arguments with respect to fiscal 1983. We hold that the tax allowance recoupments in question could not be applied as section 406 subsidy payments to the Airlines for fiscal 1983.

Thus, we are left only with the Airlines' arguments relating to the partial year, April–September 1982, covered by the 1982 appropriations act. As to that appropriations act the Airlines point to the fact that the legislation did not expressly repeal section 406. They also argue, citing our own language from *Frontier,* 764 F.2d at 738, that there is a strong general presumption against repeals by implication. *See St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 788, 101 S.Ct. 2142, 2151, 68 L.Ed.2d 612 (1981); *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299–2300, 57 L.Ed. 2d 117 (1978); and that "the doctrine disfavoring repeals by implication 'applies with full vigor when ... the subsequent legislation is an *appropriations* measure.'" *Id.* at 190, 98 S.Ct. at 2300 (quoting *Committee for Nuclear Responsibility v. Seaborg,* 463 F.2d 783, 785 (D.C. Cir.1971)) (emphasis in original). Applying the presumption against implied repeal, the Airlines also argue that the 1982 appropriations act did not expressly or impliedly amend section 406. On the premise that section 406 retained full vigor, the Airlines' reasoning proceeds as follows:

---

**7.** The Senate committee report on the continuing resolution stated, "This section *terminates the section 406 subsidy program* while providing continuing payments to air carriers," S.Rep. No. 581, 97th Cong., 2nd Sess. 11 (1982) (emphasis added). *See also* H.R.Rep. No. 914, 97th Cong., 2nd Sess. 22 (1982). The Senate report on the final appropriations bill likewise stated, "The

bill includes language which *terminates the section 406 program* while providing that carriers now serving communities which receive that service shall continue to receive equivalent payments not to exceed $13,500,000 in the aggregate," S. Rep. No. 546, 97th Cong., 2d Sess. 82 (1982) (emphasis added).

"The 1982 and 1983 enactments imposed a limit on the amount of money *appropriated in those years* which the CAB could use in attempting to meet carriers' Section 406 needs, but Congress did not prohibit or place a cap on the CAB's payment of subsidy money derived from sources other than those specific enactments, i.e., funds 'recaptured' from prior years subsidy payments or otherwise available from prior year appropriations. Accordingly, when faced with the prospect of recapturing overpayments made to Republic and Ozark for years prior to and including 1982, the CAB was statutorily obligated (1) to investigate whether the subsidies paid to those carriers during 1982 satisfied their needs under Section 406 and (2) having made the investigation and determined that the Republic and Ozark's subsidy needs had not been met by payments made from funds appropriated by the 1982 act, to apply to the otherwise to-be-recaptured prior year overpayments to those carriers' unmet subsidy needs for 1982 (and if a surplus remained, then apply the surplus to meet 1983 needs)."

Brief for Petitioners at 19–20 (emphasis in original) (footnote omitted).

Amplifying the point, the Airlines state "that Congress intended in section 406(b) to create an *entitlement* which was to survive appropriations actions." Brief for Petitioners at 24 (emphasis added).

We are unpersuaded. The 1982 appropriations act directly addressed, and limited, the subsidy payable by the Board under section 406 and, perforce, altered any "entitlement" to which the Airlines refer. The first part of the act does refer to "funds appropriated by this act" with respect to prohibiting further subsidy for points in enplaning an average of 80 or more passengers per day. But the act goes on to provide further that "notwithstanding any other provision of law, *payments* under section 406 ... *shall not exceed* a total of $14,000,000 for services provided during the period between March 31, 1982, and September 30, 1982, and to the extent it is necessary to meet this limitation, *the compensation otherwise payable by the Board under section 406 shall be reduced....*" (Emphasis added). In our view that language clearly amended the subsidy program and limited the Board's authority under section 406, just as the preceding provision prohibiting the payment of subsidy with respect to points enplaning more than eighty passengers a day *necessarily* amended the Act.

The plain import of the language in question is supported by expressions of legislative intent. Congress began phasing out the section 406 program in response to the President's recommendation that the program be eliminated entirely for the 1982 fiscal year. *Hearings on Department of Transportation and Related Agencies Appropriations, Fiscal Year 1982, before the Senate Appropriations Committee*, 97th Cong., 1st Sess. 223–24 (1981) (statement of Board Chairman Marvin Cohen). The Senate Appropriations Committee stated that its limits were intended to begin the elimination of the program: "In taking these actions, the Committee is, in effect, adopting the concept of a 3-year phaseout of this program as is reflected in legislation currently under consideration by the Senate authorizing committee." S.Rep. No. 253, 97th Cong., 1st Sess. 119–20 (1981).[8] The Senate Committee additionally stated, "[T]he section 406 subsidy program can and should be phased-out without any adverse impact on service to small communities." *Id.* at 119.

In adopting the Senate's limits on the program the Conference Committee agreed to begin reducing the program's scope. Its report thus stated:

"The conferees believe that the section 406 program should be eliminated. The funding provided in this conference agreement for section 406 is viewed as the final Federal compensation to [be]

8. The three-year phaseout refers to the period since the enactment in 1978 of the Airline Deregulation Act containing amendments to section 406, since that act first set a termination date for the program.

made available in order to facilitate an orderly close-out of this program." H.R.Rep. No. 331, 97th Cong., 1st Sess. 25 (1981). Furthermore, the 1983 appropriations act, which we have already concluded terminated the payment of subsidies under section 406, and its accompanying legislative history, are consistent with the view that Congress intended to amend the section 406 subsidy provisions by the 1982 appropriations act.[9]

■ Congress can amend substantive legislation through a provision in an appropriations act. "There can be no doubt that Congress could suspend or repeal [a statute in force] and ... it could accomplish its purpose by an amendment to an appropriations act, or otherwise." *United States v. Dickerson,* 310 U.S. 554, 555, 60 S.Ct. 1034, 1035, 84 L.Ed. 1356 (1940). Thus, as this court has stated, "[a]ppropriations acts are just as effective a way to legislate as are ordinary bills relating to a particular subject." *Friends of the Earth v. Armstrong,* 485 F.2d 1, 9 (10th Cir.1973), *cert. denied,* 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974). *Accord, American Fed'n of Gov't. Employees, AFL–CIO v. Campbell,* 659 F.2d 157 (D.C. Cir.1980), *cert. denied,* 454 U.S. 820, 102 S.Ct. 103, 70 L.Ed.2d 92 (1981); *Director, Office of Workmen's Compensation Program v. Alabama By–Products Corp.,* 560 F.2d 710, 719 (5th Cir.1977); *City of Los Angeles v. Adams,* 556 F.2d 40 (D.C.Cir.1977).

The language of the 1982 appropriations act was essentially the same as appropriations act language that the courts have held amended substantive legislation in other cases, even when such language by its terms limited only the amount and use of the appropriation. *See, e.g., United States v. Will,* 449 U.S. 200, 223, 101 S.Ct. 471, 484, 66 L.Ed.2d 392 (1980) (appropriations limit repealed statute establishing annual government employee pay raises); *Campbell,* 659 F.2d at 157 (appropriations limit repealed statute requiring blue-collar government employee to receive more than a 5.5 percent pay raise); *Adams,* 556 F.2d

at 40 (appropriations limit on administrative expenses of airport grant programs repealed act authorizing larger annual grants).

Cases cited by the airlines for the proposition that repeal or amendment by implication is disfavored do not apply. They involve fact situations vastly different from that before us. More to the point, they involve legislation far less explicit than that before us. As the Supreme Court stated in *Evangelical Lutheran,* 451 U.S. at 787–88, 101 S.Ct. at 2151, "The Court has had frequent occasion to note that such *indefinite* congressional expressions cannot negate plain statutory language and cannot work a repeal or amendment by implication." (Emphasis added). That case held that repeal of a provision exempting persons "in the employ of a school which is not an institution of higher education" from federal unemployment taxes, did not impliedly amend or repeal a provision expressly exempting persons employed by a church or other religious organization. Similarly, in *Hill,* 437 U.S. at 189, 98 S.Ct. at 2299, the Court stated:

"There is nothing in the appropriations measures, as passed, which states that the Tellico Project was to be completed irrespective of the requirements of the Endangered Species Act. These appropriations, in fact, represented relatively minor components of the lump-sum amounts for the *entire* TVA budget. To find a repeal of the Endangered Species Act under these circumstances would surely do violence to the " 'cardinal rule ... that repeals by implication are not favored.' "

(Emphasis in original) (footnote omitted) (citation omitted).

The Airlines counter that amendments to section 406 in the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (1978) ("deregulation act"), in effect contractually obligated Congress to continue the section 406 subsidy program to local airlines through December 31, 1982; and, in any event, that denying them their full

---

**9.** The Airlines acknowledge that no funds have been provided by Congress for payments pursu-

ant to Class Rate IX in any subsequent year. Brief for Petitioners at 12.

"need" subsidy would be unfair to the airlines since they relied on the four-year subsidy continuation provisions of that statute.

The deregulation act reflected multiple congressional concerns. Such concerns included, among other things, the cost of existing subsidies being paid to local service airlines, the maintenance of air service to smaller communities, and the economic well being of the airlines themselves for a period of time necessary to accomplish the transition to a less regulated environment. *See* Senate Rep. No. 631, 95th Cong., 2d Sess. 68–75, 88–92 (1978). Congress enacted a new provision, section 419 of the Act (49 U.S.C. § 1389), which guaranteed continued service to small cities for ten years. Upon 90–days' notice carriers were permitted to terminate service to unprofitable points without prior hearing and board approval. 49 U.S.C. § 1371(j); 49 U.S.C. § 1389(a)(3). However, if the Board determined that continuing service was necessary, it could order the Airline to maintain service. 49 U.S.C. § 1389(a)(6). If the carrier required to maintain service had received section 406 subsidy for serving the point, its compensation was required to equal the amount payable under its section 406 subsidy rate. 49 U.S.C. § 1389(a)(7).

The so called "Mineta Amendment" to the deregulation act amended section 406 by adding the following:

> "(2) Section 406(b) of the Federal Aviation Act of 1958 is amended by inserting after the second sentence the following new sentence: 'Notwithstanding any other provision of this section, rates of compensation paid to any carrier under this section for service performed between the date of enactment of this sentence and January 1, 1983, shall be based on the subsidy need of such carrier with respect to service performed to points for which such carrier was entitled to receive compensation for serving during calendar year 1977. In the case of any local service carrier, such subsidy need shall be based on the adjusted eligible need of such carrier determined in a matter consistent with the provisions of Local Service Class Subsidy Rate VIII, with technical adjustments....'"

Airline Deregulation Act of 1978, Pub.L. No. 95–504, § 24(a)(2), 92 Stat. 1705, 1725 (1978). In offering his amendment, Mr. Mineta remarked that there "has been considerable concern expressed about the board's recent proposals relating to subsidized air service" and that the amendment "simply reaffirms, in more precise language, the policy determination made by the Committee that *for the next four years* the small community service program be maintained *on the present basis.*" 124 Cong. Rec. H10,308 (daily ed. Sept. 21, 1978) (Statement of Rep. Mineta) (emphasis added).[10]

The deregulation act does support the Airlines' argument. It also cuts against it. The deregulation act reflected congressional dissatisfaction with the section 406 subsidy program, substantially altered the law relating to air service to smaller communities,[11] and inserted a death knell provision for section 406 subsidy payments ("The board shall make no payments under this

---

**10.** The "recent proposals" referred to by Representative Mineta were proposals being considered by the Board which would have redefined "need" to eliminate subsidy for any community enplaning less than five or more than twenty-five passengers a day or which was not "isolated." *See Id.* at H10,307.

**11.** In connection with establishing a new "essential air transportation" program for small community service, § 419 of the Act, 49 U.S.C. § 1389, Congress allowed commuter air carrier participation. Sen. Rep. No. 631, *supra*, at 71–72; 124 Cong. Rec. S 5855 (daily ed., April 19, 1978). It authorized the Board after 1982 to transfer a section 406 carrier's route to a commuter carrier if doing so would provide better

service at lower cost. 49 U.S.C. § 1389(a)(11)(A). The Act also made it far easier for any carrier to stop serving a point. The Act had earlier required a carrier to serve all points listed on its certificate unless, after a hearing, the Board authorized it to end service. 49 U.S.C. § 1371(g), (j) (1976 ed). As already indicated, the deregulation act instead allowed a carrier to end service merely by giving ninety days advance notice, unless the Board determined that the community would lose essential air service due to the lack of of replacement service. 49 U.S.C. § 1371(j); 49 U.S.C. § 1389(a)(3). *See, e.g., City of New Haven v. Civil Aeronautics Bd.,* 618 F.2d 955 (2nd Cir. 1980).

section for any services performed after January 1, 1986." 49 U.S.C. § 1376(c)).

The 1982 and 1983 appropriations acts merely continued to reflect the already evident congressional dissatisfaction with the cost effectiveness of local service airline subsidies. The fact that such dissatisfaction resulted in an absolute cap on section 406 subsidy payments nine months prior to the expiration of the four year period specified in the Mineta Amendment, and a prohibition on section 406 subsidy for future service to points that enplaned an average of 80 or more passengers per day, is not surprising. The legislation was plainly in context. That is particularly true in view of the fully subsidized section 419 program in effect. And, the legislation was undoubtedly within the power of Congress to effect.

The Airlines' own conduct belies their present position. To implement the mandates of Congress contained in the 1982 and 1983 appropriations acts, the Board first issued its order limiting each carrier's subsidy in compliance with the 1982 appropriations act ceiling, and prohibiting subsidy for service to points enplaning more than an average of 80 passengers per day. 95 CAB 245 (1982). Order 82–4–7 (1982), R. at 41. Thereafter, the Board terminated the section 406 program as to these Airlines in obedience to the 1983 appropriations act, Order 82–10–9 (Oct. 5, 1982), R. at 82, and established the one year subsidy replacement program authorized by Congress, Order 82–12–74 (Dec. 16, 1982), R. at 85. The airlines did not challenge either of those orders in court notwithstanding their present argument that the appropriated funds would not satisfy their "entitlement" under the Act, and that the orders "were contrary to the governmental commitments enacted by Congress in 1978." Brief for Petitioners at 13.[12]

Our conclusions are not inconsistent with *New York Airways, Inc. v. United States,*

369 F.2d 743, 177 Ct.Cl. 800 (1966), relied on by the Airlines. In *New York Airways* the court of claims held that the appropriations act for fiscal 1965, which deliberately underfunded section 406 subsidy payable for helicopter mail services already rendered under existing rate orders, did not amend the basic statute, section 406, with respect to the Board's rate making power. It further held that the wording of section 406 empowered the Board to obligate the United States for the payment of an agreed subsidy in the absence or deficiency of a congressional appropriation. *Id.* 369 F.2d at 744–45. The court granted judgment to the plaintiff carriers in the amount of their unmet subsidy "need" under section 406, as calculated under the existing rate order, despite Congress' refusal to appropriate sufficient funds. The Board's rate order, and the carriers' actual transportation of mail was viewed by the court as creating a contract at least implied in fact. *Id.* at 751.

However, the major premise upon which the *New York Airways'* decision rests is that the appropriations act in question did not clearly express Congress' intention to modify the underlying statute. The appropriations act did not mention section 406, and the relevant legislative history left no doubt that Congress knew it was not altering obligations authorized under section 406, and did not so intend. Quite the opposite situation is before us. The appropriations acts in question specifically referred to section 406, specifically referred to and limited the Board's authority to pay subsidies, and clearly reflected Congress' intention to curtail and phase out section 406 subsidy payments for future periods, (i.e. after March 31, 1982). The Board recognized those facts in its concurrent implementing orders, in which, contrary to what occurred in *New York Airways,* the Airlines tacitly acquiesced by their failure to contest.[13]

---

12. The Airlines argue that the orders were merely mechanical, so there was nothing to challenge. The argument is unpersuasive since the orders resulted in only fractional subsidy payments to the Airlines under Class Rate IX, and the Airlines filed no claim for the alleged un-

paid amounts until this present controversy over the tax allowance overpayments arose from the Board's order in August, 1984.

13. It is interesting to note that in *Frontier* the Frontier Airlines' position was that the appropriations acts in question *did* in fact repeal

### III.

We have considered all of the arguments of the Airlines, addressing those we deemed meritorious. We hold that the Board's order directing Republic and Ozark to refund tax allowance overpayments for the years in question, and refusing to apply those overpayments to alleged unmet subsidy "need" under section 406 and Class Rate IX was fully in accordance with the law and was not arbitrary and capricious. The order of the Board is AFFIRMED.

section 406 in its entirety, thus depriving the Board of its authority to recapture tax overpayments in prior years. *Frontier* argued before the Board and then before this court that the appropriations acts substantively changed the underlying statute, eliminating subsidies based on "need." *Frontier* at 737. We agreed with *Frontier* that the airlines' subsidy program created by section 406 had indeed been altered

by the appropriations acts insofar as any entitlement to subsidies was concerned. Our disagreement with the position of Frontier Airlines went only to the continuing authority of the Board to resolve past controversies, including the recapture of tax overpayments. Obviously, Frontier did not have any illusion as to the effect of the 1982 and 1983 appropriations acts on the section 406 subsidy program.