Brandon CALLOWAY, et al.,
Appellants/Cross–
Appellees

v.

DISTRICT OF COLUMBIA, et al.,
Appellees/Cross–Appellants

Nos. 99–5215, 99–5216

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 8, 1999.

Decided June 30, 2000

Steven L. Leifer argued the cause for appellants/cross-appellees. With him on the briefs were Lois McKenna Henry, Joshua B. Frank, Paul Levy, Beth Goodman, Mathew Bogin, Margaret Kohn,and Paul Dalton.

Edward E. Schwab, Assistant Corporation Counsel, Office of the Corporation Counsel, argued the cause for appellees/cross-appellants District of Columbia, et al. With him on the brief were Robert R. Rigsby, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel. Donna M. Murasky, Assistant Corporation Counsel, entered an appearance.

Alfred Mollin, Attorney, U.S. Department of Justice, argued the cause for appellee/cross-appellant United States of America. With him on the brief were David W. Ogden, Acting Assistant Attorney General, Michael Jay Singer, Attorney, and Wilma A. Lewis, U.S. Attorney.

Before: GINSBURG, TATEL and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Separate opinion dissenting in part filed by Circuit Judge GINSBURG.

TATEL, Circuit Judge:

A rider to the District of Columbia Appropriations Act imposes limits on fees the District may pay under the Individuals with Disabilities Education Act, known as IDEA, to attorneys who represent prevailing parties in actions against the D.C. Public Schools. In this suit by disabled students and their parents, the district

court rejected challenges to the fee cap, finding it neither preempted by IDEA nor contrary to the Due Process Clause of the Fifth Amendment. The district court also held that the rider restricts only the District's authority to pay attorneys' fees, not court authority to award fees pursuant to IDEA. Finding no error, we affirm in all respects.

I

The Individuals with Disabilities Education Act seeks to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). As a condition of receiving funds under the Act, IDEA requires school districts to adopt procedures to ensure appropriate educational placement of disabled students. *See* 20 U.S.C. § 1413. In addition, school districts must develop comprehensive plans for meeting the special educational needs of disabled students. *See* 20 U.S.C. § 1414(d)(2)(A). Known as "individualized education programs," or IEPs, these plans must include "a statement of the child's present levels of educational performance, . . . a statement of measurable annual goals, [and] a statement of the special education and related services . . . to be provided to the child . . . ." 20 U.S.C. § 1414(d)(1)(A).

IDEA guarantees parents of disabled children an opportunity to participate in the identification, evaluation, and placement process. *See* 20 U.S.C. §§ 1414(f), 1415(b)(1). Parents who object to their child's "identification, evaluation, or educational placement" are entitled to an "impartial due process hearing," 20 U.S.C. §§ 1415(b)(6), (f)(1), at which they have a "right to be accompanied and advised by counsel." 20 U.S.C. § 1415(h)(1). Parents "aggrieved by" a hearing officer's findings and decision may bring a civil action in either state or federal court without re-

gard to the amount in controversy. 20 U.S.C. § 1415(i)(2).

Section 1415(i)(3)(B) of IDEA gives courts authority to "award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." Prevailing parents may also recover fees incurred during administrative proceedings. *See Moore v. District of Columbia,* 907 F.2d 165 (D.C.Cir.1990) (en banc). The amount of fees awarded "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C).

The District of Columbia Public Schools (DCPS) has failed to meet its obligations under IDEA, a fact no one disputes. In its brief, the United States describes DCPS's situation this way:

> By 1998, the District of Columbia School System's . . . failure to fulfill its obligations under IDEA reached crisis proportions. The District had virtually ceased to conduct timely hearings requested by parents under IDEA and to issue final decisions within the required timelines. Other of its obligations under IDEA were also not being met to a significant extent.

*See also Blackman v. District of Columbia,* 185 F.R.D. 4, 5 (D.D.C.1999) (finding that DCPS's noncompliance with IDEA has resulted in "significant delays both in the placement of children in appropriate educational settings and in the provision of crucial medical services, delays that have the potential to permanently harm the physical and emotional health of many young children."). At a June 1997 public hearing, DCPS identified several factors responsible for its noncompliance, including "inadequate management[,] . . . . poor information management systems, lack of staff training, inappropriate staff allocation and lack of appropriate programs." *Notice of Written Findings and Decision and Compliance Agreement,* 63 Fed.Reg.

41370, 41373. A year later, the Secretary of Education stated that, after "working with DCPS over a number of years to address its serious and ongoing failure to comply with the requirements of [IDEA]," he determined that immediate compliance was "not feasible." *Id.* at 41371. The Secretary and DCPS entered into a Compliance Agreement mandating that DCPS "be in full compliance with the requirements of [IDEA in] no later than three years." *Id.* at 41374.

DCPS's failure to meet the special education needs of its disabled students has resulted in an exceedingly large number of parental complaints. The record shows that in 1995, although DCPS served less than two-thousandths of one percent of the nation's disabled students, over forty-five percent of requests for due process hearings nationwide were made in D.C.

Because IDEA authorizes the award of attorneys' fees, parental complaints have been costly for DCPS. In fiscal year 1998, for example, the school district paid over $10 million to attorneys. That same year, the *Washington Post* reported that legal representation of special education students, once "an obscure niche," had developed into a "booming, lucrative industry." Doug Struck and Valerie Strauss, *Special Ed Law Is Big Business; Students' Attorneys Collectively Receiving Millions in Fees*, THE WASH. POST, July 20, 1998, at B7. Describing special education cases as "easy [to] win," the *Post* stated that "when the city's school system is crying for money to try to build an adequate special education system—and thereby begin to lessen the flood of legal challenges—these attorney fees rankle school officials who say the money should be spent on children." *Id.*

Responding to the concerns expressed in the *Post* article, the House Committee on Appropriations, while considering the District's fiscal year 1999 appropriations request, acted to stem "the growth in legal expenses ... and the usurping of resources from education to pay attorney fees." H.R. Rep. 105–670, at 50 (1998). The Committee adopted an appropriations rider that, in order to allow DCPS to "focus more clearly on teaching and learning rather than on litigation and expensive legal fees," limited the District's fee payments under IDEA. *Id.* Eventually becoming section 130 of the 1999 D.C. Appropriations Act, the rider imposed caps on both the hourly rate and total amount of compensation the District could pay lawyers of parents who prevail in IDEA actions and proceedings. *See* Section 130 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub.L. 105–277, 112 Stat. 2681 (October 21, 1998) (hereinafter, section 130). Specifically, section 130 provided that 1999 funds could not be used to pay attorneys' fees in excess of the amount at which the D.C.Code fixes compensation of attorneys who represent indigent defendants charged with misdemeanors: $50 per hour and $1,300 overall. *See* section 130; D.C.Code Ann. § 11–2604(a); D.C.Code § 11–2604(b)(1). Section 130 allowed the maximum total payment, but not the maximum hourly rate, to be waived for "extended or complex representation." *See* section 130; D.C.Code Ann.§ 11–2604(c). In its entirety, section 130 reads as follows:

> None of the funds contained in this Act may be made available to pay the fees of an attorney who represents a party who prevails in an action, including an administrative proceeding, brought against the District of Columbia Public Schools under the Individuals with Disabilities Education Act (20 U.S.C. § 1400 *et seq.*) if—
>
> (1) the hourly rate of compensation of the attorney exceeds [$50]; or
>
> (2) The maximum amount of compensation of the attorney exceeds [$1,300], except that compensation and reimbursement in excess of such maximum may be approved for extended or complex representation in accor-

dance with section 11–2604(c), District of Columbia Code.

Congress included a similar rider in the District's fiscal year 2000 appropriations bill. Fearful of the rider's impact on disabled children, President Clinton vetoed the bill. "In the long run," the President's veto message explained, "this provision would likely limit the access of the District's poor families to quality legal representation, thus impairing their due process protections provided by ... IDEA." *See District of Columbia Appropriations Act, 2000—Veto Message from The President of The United States* (H. Doc. No. 106–135), 145 Cong. Rec. H8941, H8942 (Sept. 28, 1999). Persisting, Congress included the fee cap (with minor revisions not relevant to this litigation) in a reenacted FY 2000 appropriations bill. This time the President signed. *See* Section 129, District of Columbia Appropriations, 2000, Pub.L. No. 106–113, 113 Stat. 1501, 1517 (November 29, 1999).

Before the enactment of the FY 2000 appropriations bill, seven disabled children and their parents filed suit against the District in the United States District Court for the District of Columbia challenging section 130 of the FY 1999 Appropriations Act. The families allege that the fee cap prevents them from retaining qualified legal counsel on a contingency basis. One plaintiff unable to find counsel declared: "I spoke with ... one of the attorneys who specializes in education law ... who informed me that, due to the passage of Section 130 of the D.C. Appropriations Act, her firm was no longer able to accept special education cases on a contingency basis. She indicated that she was not aware of any other private attorney in the District of Columbia who would...."

The families mounted two challenges to section 130. Relying on the Supremacy Clause of Article VI of the Constitution, they argued that section 130—which they referred to as a "local law"—is preempted by IDEA. They also argued that by singling out disabled children residing in the District of Columbia for unfavorable treatment, section 130 violates the Due Process Clause of the Fifth Amendment. Finally, the families sought a declaratory ruling that section 130 does not affect a district court's authority to award reasonable attorneys' fees under IDEA. Pursuant to 28 U.S.C. § 2403(a), the United States intervened to defend section 130's constitutionality. The District of Columbia, which joined the United States' defense of the statute, argued that section 130 amended IDEA, thus barring courts in D.C. from awarding fees in excess of the amount the District is authorized to pay.

Rejecting plaintiffs' challenges to section 130, the district court granted summary judgment in favor of the District. The court also rejected the District's interpretation of section 130, ruling that the rider had "done nothing to affect the district court's ability under [IDEA] to base a determination of reasonable attorneys' fees [on] rates prevailing in the community."

The families now appeal, and the District of Columbia cross-appeals. Although the United States defends section 130's constitutionality, it takes no position on the proper interpretation of the section. Our review of all issues is *de novo*. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994) ("Our review of the grant of summary judgment is *de novo*, applying the same standards as the district court."); *United States v. Williams–Davis*, 90 F.3d 490, 512 (D.C.Cir.1996) (applying *de novo* review to a question of statutory construction).

II.

Beginning with the families' appeal, we can easily dispose of their Supremacy Clause argument. Because IDEA is national legislation, the families argue, it preempts under the Supremacy Clause any state or local legislation that impedes its accomplishment, such as section 130. In support, the families cite *Brown v. United States*, 742 F.2d 1498, 1502 (D.C.Cir.1984) (en banc), where we stated

that "Congress frequently enacts legislation applicable only to the District and . . . . [a]bsent evidence of contrary congressional intent, such enactments should be treated as local law, interacting with federal law as would the laws of the several states." Even assuming the Supremacy Clause applies to Congress when it legislates for the District under Article I, section 8 of the Constitution—a proposition for which we have found no persuasive support—the families' argument suffers from a fatal weakness: it requires us to believe that Congress enacted section 130 for the purpose of having it instantaneously preempted by a statute enacted over a decade earlier. *See Cipollone v. Liggett,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis.") (internal quotation marks omitted).

We turn to the families' equal protection challenge. They argue that section 130, by limiting their ability to obtain counsel and leaving them "powerless to enforce their IDEA rights," treats them differently from non-D.C. families with disabled children, in violation of the equal protection guarantee of the Fifth Amendment's Due Process Clause. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (applying equal protection principles to the District of Columbia through the Due Process Clause of the Fifth Amendment). To assess this claim, we must first determine the appropriate level of scrutiny. Most laws will survive equal protection challenge if they bear a rational relationship to a legitimate governmental purpose. *See Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). More searching scrutiny is reserved for laws that either burden a suspect class or impinge upon a fundamental interest. *See id.* The families urge us to apply heightened scrutiny for two reasons: residents of D.C. are themselves a suspect class, and section 130 burdens the educational opportunities of a disadvantaged group, *i.e.,* children with disabilities.

■ This court has twice considered claims that D.C. residents comprise a suspect class. The first case, *United States v. Thompson,* 452 F.2d 1333 (D.C.Cir.1971), concerned a district court's application of D.C. bail provisions to deny appellant bail pending appeal following his conviction for violating federal narcotics laws. Appellant argued that the D.C. bail provisions applied only to local offenses (ones contained in the D.C.Code) and that because he had been convicted of a national offense (one contained in the U.S.Code), his bail application should have been judged by the more lenient criteria applicable to national offenses in other jurisdictions. *See id.* at 1337–38. This court agreed, stating that application of D.C. bail provisions to U.S.Code offenses would violate the Due Process Clause by treating U.S. code violations in D.C. differently from such violations in all other jurisdictions. *See id.* at 1340–41. The opinion contains language that supports the families' position:

> Minorities can usually protect themselves by playing their role in the political process and forming coalitions with other groups to secure a majority. But it is senseless to remit District residents to the political process, since for them there *is* no political process . . . . In this context, . . . the normal arguments for judicial restraint become no more than hollow shibboleths grotesquely detached from the logic which once supported them . . . . Therefore, discriminatory classifications affecting District residents must be subjected to the strictest possible review.

*Id.* at 1341 (internal citation omitted).

This court next considered the suspect class status of D.C. residents in *United States v. Cohen,* 733 F.2d 128 (D.C.Cir. 1984) (en banc). Sitting *en banc,* the court departed from the reasoning of *Thompson* and applied rational basis review to uphold a statute requiring civil commitment for D.C. defendants found not guilty by reason of insanity. *See id.* Explaining why the

statute did not burden a suspect class, *Cohen* first noted that the affected group consisted not just of District residents, but "principally of those who commit crimes within the District, a class within which ... many residents of other states ... are likely to be included...." *Id.* at 135. Then, in language relied on by the government in this case, *Cohen* said the following:

> [E]ven if one accepts the thesis that the class in question is residents of the District of Columbia, the mere lack of the ballot does not establish political powerlessness, or, if it does, political powerlessness alone is not enough for "suspect class" status. Minors, for example, are not a suspect class. It is, in any event, fanciful to consider as "politically powerless" a city whose residents include a high proportion of the officers of all three branches of the federal government, and their staffs.

*Id.* (internal citation omitted).

According to the families, this language is dicta because the court interpreted the civil commitment statute as not classifying on the basis of residence. The families urge us to follow *Thompson* and apply heightened scrutiny to section 130. We are not so free. Whatever force *Thompson*'s reasoning about the status of D.C. residents once carried, it has not survived *Cohen*. To begin with, by pointing out that the civil commitment statute at issue in *Cohen* applies to anyone tried in the District, not just to District residents, *Cohen* implicitly undermined *Thompson*, for notwithstanding *Thompson*'s apparent holding that D.C. residents are a suspect class, the D.C. bail provisions also apply to persons tried within the District, regardless of residency. Moreover, *Cohen* expressly repudiates *Thompson*'s equal protection reasoning. "We ... disapprove ... the rationale expressed in [*Thompson*] that distinctive legislative treatment of the District is 'particularly suspect' and thus requires more than a rational basis to support it." *Id.* at 136 n. 12. Although *Cohen*'s discussion of the suspect class status

of D.C. residents was not critical to its holding—the court had already recognized that persons tried within the District need not reside there—its analysis evolved from considerable debate within the court. A portion of the court's opinion responds to a concurring opinion's effort to devise a framework by which differential treatment of D.C. residents would, in certain circumstances, raise special equal protection concerns. *See id.* at 132 n. 10, 136 n. 12, responding to *id.* at 141–50 (Mikva, J., concurring). For all of these reasons, a panel of this court may not now depart from the *en banc* court's conclusion that D.C. residents do not comprise a suspect class for equal protection purposes.

In support of their second argument for heightened scrutiny—that section 130 burdens the educational opportunities of a disadvantaged group—the families rely on *Plyler v. Doe*, 457 U.S. 202, 223–24, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), which applied heightened scrutiny to invalidate a Texas statute denying public education to children not legally admitted to the United States. In subsequent cases, however, the Supreme Court limited *Plyler* to its facts. In *Kadrmas v. Dickinson Public Schools*, the Court rejected a claim that charging some students a fee for transportation to school triggered heightened scrutiny under *Plyler*, saying "we have not extended [*Plyler*'s] holding beyond the unique circumstances that provoked its unique confluence of theories and rationales." 487 U.S. 450, 459, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988) (internal citations and quotation marks omitted). Those "unique circumstances" are not present here. In *Plyler*, the doors to the public schools were completely closed to children of undocumented aliens. *See Plyler*, 457 U.S. at 205, 102 S.Ct. 2382. Although section 130 may make it less likely that disabled children will receive an education that conforms to IDEA, the doors to the schoolhouse remain open, as they did in *Kadrmas*. And the Supreme Court has made clear that a statute bur-

dening the educational opportunities of disadvantaged children does not by that fact alone trigger heightened scrutiny. *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (applying rational basis review to uphold Texas's use of property taxes to finance local school districts even though that funding system resulted in fewer educational opportunities for poor students than for students in districts with richer tax bases).

■ We thus review the families' equal protection challenge under the rational basis standard. We ask whether "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). "On rational-basis review, a ... statute ... comes to us bearing a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (internal citations and quotation marks omitted).

Pointing to *The Washington Post* article, the District's brief refers to "evidence of abuse by attorneys in the legal services process," presumably implying—though never directly so stating—that section 130 was designed to curb excessive or unjustified fees. The families and their lawyers resist any such charges, and at oral argument counsel for the District conceded that the city has no evidence of attorney misconduct. The District, moreover, "adopts" the United States' brief, which argues not that section 130 stemmed from evidence of attorney abuse, but that in view of DCPS's manifest inability to meet its obligations under IDEA, Congress could rationally have concluded that "it was more important for the District to spend its funds on remedying these systemic defects and providing primary services rather than upon litigation fees."

According to the government, then, section 130's legitimate governmental purpose is to assist disabled children in D.C. by allocating additional funds to primary special education services. The statute is rationally related to that objective, we are left to infer, because limiting payments to attorneys will leave more funds available for direct services.

The families raise several reasons to doubt that section 130 will yield the benefits claimed by the government. As the families point out, nothing requires DCPS to reallocate section 130 savings to special education services, nor does the record indicate that such funds have been so reallocated. Rather, the families claim, the District's annual budget has simply been reduced by the amount of fees saved. Moreover, section 130 limits attorneys' fees even when paid from sources other than DCPS's budget; while the statute caps fees for both administrative proceedings and court litigation, payments for the latter come from the Corporation Counsel's Settlement and Judgment fund. Finally, the families ask, even if section 130 actually made more funds available for special education, would any improvements that might flow from such expenditures outweigh section 130's harmful effects?

■ Whatever the doubts about section 130, "rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller*, 509 U.S. at 319, 113 S.Ct. 2637 (internal quotation marks omitted). "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Beach Communications*, 508 U.S. at 314, 113 S.Ct. 2096. Moreover, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit be-

tween means and ends." *Heller,* 509 U.S. at 321, 113 S.Ct. 2637.

■ Applying these highly deferential principles, we cannot conclude that Congress acted irrationally. Assisting disabled children is a legitimate governmental purpose. It is at least conceivable, moreover, that capping fees will produce additional resources for direct educational services, and that, despite limiting parents' ability to use litigation as a means of enforcing IDEA, section 130 will yield a net benefit for disabled children. Notwithstanding the doubts of the families and the President, *supra* at 8–9, 4–5, that possibility suffices for the statute to survive rational basis review.

### III.

■ In its cross-appeal, the District argues that section 130 not only prohibits the District from paying attorneys' fees greater than the prescribed amounts, but also prohibits courts from awarding such fees. In resolving this claim, we are guided by the well-settled principle that "[w]hile appropriation acts are 'Acts of Congress' which can substantively change existing law, there is a very strong presumption that they do not." *Building & Construction Trades Dept., AFL–CIO v. Martin,* 961 F.2d 269, 273 (D.C.Cir.1992). As we have elsewhere observed, "the established rule [is] that, when appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly. Such measures have the limited and specific purpose of providing funds for authorized programs." *Donovan v. Carolina Stalite Co.,* 734 F.2d 1547, 1558 (D.C.Cir.1984) (internal citation and quotation marks omitted). Applying this principle, we agree with the district court that section 130 limits only District authority to pay fees from FY 1999 appropriations, not court authority to award fees under IDEA.

We begin, as we must, with section 130's plain language: "None of the funds con-

tained in this Act may be made available to pay the fees of an attorney who represents a party who prevails in an action ... brought against [DCPS] under [IDEA]" in excess of $50 per hour or $1,300 total. Note that nothing in section 130 restricts court authority to award fees under section 1415(i)(3)(B) of IDEA; the rider concerns only District authority to pay fees from FY 1999 appropriations. As the district court observed, section 130 and IDEA regulate different government authorities: "The IDEA attorney's fees provision provides the courts with discretion ... to award reasonable attorneys' fees. By contrast, section 130 governs the District of Columbia's appropriations and right to pay those fees."

To be sure, restricting federal court authority to award fees might have been one way for Congress to help DCPS address its special education problems. It is not our function, however, to determine whether such a limitation would "accor[d] with common sense and the public weal. Our Constitution vests such responsibilities in the political branches." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (internal quotation marks omitted); *but see* Op. at 15 (Ginsburg, J., dissenting) (arguing that "common sense tells us" that section 130 is "a limitation upon the district court's authority to award attorneys' fees").

In view of the "very strong presumption" that appropriation acts do not amend substantive law, we face a straightforward question of statutory construction: has Congress unambiguously expressed an intent to limit court authority to award fees under IDEA? When Congress wants to use an appropriations act to limit court authority, it knows precisely how to do so. For example, section 311 of the 2000 Appropriations Act says, "section 5 of the Y2K Act ... is amended" to state that "punitive damages in a Y2K action may not be awarded against an institution of higher education." Section 311, Consolidated Appropriations Act, 2000, Pub.L.

106–113, 113 Stat. 1501, 1537 (Nov. 29, 1999). Section 130 contains no similar limiting language.

■■■ The District argues that even if section 130 does not expressly amend IDEA, the appropriations rider nevertheless represents an implied limit on court authority to award fees. Otherwise, the District claims, section 130 might increase the District's eventual fee liability by encouraging litigation to recover fees in excess of section 130's caps. Repeals by implication, however, are disfavored—a policy that "applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act." *TVA*, 437 U.S. at 190, 98 S.Ct. 2279. "[I]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Id.* (internal quotation marks omitted). No irreconcilable conflict exists here since, as we have pointed out, section 130 and IDEA are directed at different governmental entities.

Like the district court, we recognize the potential incongruity of courts' awarding fees that section 130 prohibits the District from paying during the same fiscal year. As the Supreme Court has made clear, however, reconciling inharmonious statutory directives is Congress' responsibility, not courts'. In *TVA v. Hill*, the Supreme Court faced a situation similar to this case. Acting pursuant to the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, the Sixth Circuit halted construction of a nearly completed TVA dam in order to preserve the critical habitat of the snail darter. *See TVA*, 437 U.S. at 168–70, 98 S.Ct. 2279. In the Supreme Court, TVA argued that Congress, by appropriating funds for completion of the dam after learning that the snail darter had been placed on the endangered species list, had implicitly amended the Endangered Species Act to allow construction to continue. *See id.* at 189–90, 98 S.Ct. 2279. Disagreeing, the Court explained that "[w]hile it is emphatically the

province and duty of the judicial department to say what the law is, it is equally— and emphatically—the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation." *Id.* at 194, 98 S.Ct. 2279 (internal citation and quotation marks omitted). Just as the Supreme Court left it to Congress to resolve the incongruity of appropriating funds for a dam that another statute prohibited, we leave to Congress the resolution of the incongruity in this case.

The cases relied on by the dissent do not require a different result. *See* Op. at 13–18 (Ginsburg, J., dissenting). In *American Federation of Government Employees, AFL–CIO v. Campbell*, 659 F.2d 157 (D.C.Cir.1980), we held that an appropriations rider containing language similar to section 130 "modified *pro tanto*" a substantive statute. 659 F.2d at 161. The rider provided that "[n]o ... funds appropriated for the fiscal year [1979] may be used to pay the salary or pay of any individual ... in an amount which exceeds [a five and one-half percent raise] as a result of any adjustments ... under [the 'prevailing rate' act]." Pub.L. No. 95–429, § 614(a), 92 Stat. 1001, 1018 (1978). Had the prevailing rate statute been given effect, government employees would have received raises in 1979 of between seven and twelve percent. Because of the appropriations rider, however, pay increases that year were limited to five and a half percent. Government employees "sued to enforce their alleged rights to wage increases based solely on the ... prevailing rate statute." *Campbell*, 659 F.2d at 159. We rejected their claim, concluding that the appropriations act, by including a new ceiling on wage increases, and "by express reference to the earlier statute, effectively modified [it]." *Id.* at 161. We thus gave the appropriations act the effect that its express terms required—limiting pay increases for FY 1979.

Observing that section 130 expressly refers to IDEA and includes a fee schedule, our dissenting colleague relies on *Campbell* for the conclusion that Congress intended to modify IDEA. *See* Op. at 14–15 (Ginsburg, J., dissenting). We think *Campbell* and this case are different. As in *Campbell*, we have given the rider the effect that its plain text requires—limiting the District's payment of fees for FY 1999—but this case presents an additional question, one not raised in *Campbell*: in the absence of clear legislative intent, evidenced either through statutory language or legislative history, to amend substantive law, does an appropriations act funding one governmental entity restrict the substantive authority of a separate entity, indeed a separate branch of government? Given the "very strong presumption" that appropriation acts do not amend substantive statutes, neither section 130's reference to IDEA nor its fee schedule warrants an inference that an appropriations rider directed at the District of Columbia restricts the authority of the federal courts. Indeed, Congress could hardly have identified the class of payments affected by section 130 without mentioning IDEA. Nor could Congress have limited the District's FY 1999 payments without specifying the amounts of those limits.

If, as the dissent claims, section 130's ceiling on payments and reference to IDEA sufficed to modify IDEA, the existing presumption would be reversed and replaced with a presumption that appropriation riders do amend substantive law. Under the dissent's theory, Congress could limit the District's fee payments from particular appropriations without also restricting court authority to award fees only by adding an express statement that substantive law remains intact. That is not the law of this circuit.

*National Treasury Employees Union v. Devine*, 733 F.2d 114 (D.C.Cir.1984), is equally distinguishable. *See* Op. at 17 (Ginsburg, J., dissenting). That case concerned Office of Personnel Management regulations establishing new personnel policies for federal employees. Dissatisfied with the new policies, Congress passed an appropriations rider providing that "[n]one of the funds appropriated under this Act [funding OPM] shall be obligated or expended to implement, promulgate, administer, or enforce [the OPM regulations]." *Devine*, 733 F.2d at 116. The Director of OPM interpreted the rider to mean that "each federal agency would simply have to administer and enforce the regulations without OPM's assistance...." *Id.* at 116. We rejected this interpretation of the rider, resting our decision on two factors. First, because "the express terms of the regulations require[d] OPM to play a critical and continuing role in their implementation, administration, and enforcement," *id.* at 119, we doubted whether the regulations could "sensibly ... be effectuated without OPM's continued participation." *Id.* at 120. Indeed, we viewed the Director's interpretation of the rider as "abdicating [OPM's] central responsibility for executing, administering, and enforcing civil service rules and regulations." *Id.* at 119 (internal quotation marks omitted). Second, after examining the rider's legislative history, we found "clear indications of Congress' intent" to foreclose significant changes in personnel management policies. *Id.* at 120.

Neither factor is present in this case. To begin with, because the District plays no role in a court's awarding of fees, section 130 does not prevent the implementation of IDEA's fee provision in the same manner as the rider in *National Treasury Employees Union v. Devine* impeded implementation of OPM's regulations. Nor, for the same reason, does section 130 produce any "abdication" of District responsibility. Moreover, section 130's legislative history demonstrates no clear congressional intent to amend IDEA. Although the House Appropriations Committee wrote of an earlier version of section 130 that it would limit "the award of attorney fees,"

H.R.Rep. No. 105–670, at 50 (1998), *see also* Op. at 14–15 (Ginsburg, J., dissenting), the Conference Report accompanying the final bill speaks only of "plac[ing] a limit on the payment of fees to attorneys." H.R. Conf. Rep. No. 105–825, at 1116 (1998). As the Supreme Court has observed, "[l]egislative materials may be without probative value, or contradictory, or ambiguous, . . . and in such cases will not be permitted to control the customary meaning of words. . . ." *United States v. Dickerson*, 310 U.S. 554, 562, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940).

To sum up, because we must narrowly construe section 130; *see Donovan*, 734 F.2d at 1558, we interpret it to accomplish neither more nor less than its plain text states. The rider's express terms restrict District payment of IDEA fees from FY 1999 appropriations. We give section 130 precisely that effect. If Congress wishes to restrict court authority to award fees against the District, it may do so either through the D.C. appropriations bill or through the enactment of substantive legislation amending IDEA. But until Congress demonstrates clear intent to modify substantive law, either through statutory language or persuasive legislative history, we presume in accordance with circuit precedent that it did not use section 130 to limit the power of federal courts to award fees under IDEA.

The decision of the district court is affirmed.

*So ordered.*

GINSBURG, Circuit Judge, dissenting in part:

I concur in Parts I and II of the opinion for the Court and in the judgment in No. 99–5215, rejecting the families' constitutional challenges. I dissent from Part III of the opinion and from the judgment in No. 99–5216 because I believe that for FY 1999 the Congress modified the authority of the district court to award attorneys' fees under § 615 of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415.

## I. Background

The Congress reenacted § 615 of the IDEA with considerable revisions in 1997. *See* Individuals with Disabilities Education Act Amendments for 1997, Pub.L. No. 105–17, § 101, 110 Stat. 37, 88 (1997). Section 615 includes the following provision for attorneys' fees:

> In any action or proceeding brought under this section, the [district] court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party.

*Id.* at 92, *codified at* 20 U.S.C. § 1415(i)(3)(B).

The Congress revisited the subject of attorneys' fees in IDEA cases two years later when it passed the District of Columbia Appropriations Act of 1999. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub.L. No. 105–277, § 101(c), 112 Stat. 2681 (1998). Section 130 of the 1999 D.C. Appropriations Act provides:

> None of the funds contained in this Act may be made available to pay the fees of an attorney who represents a party who prevails in an action, including an administrative proceeding, brought against the District of Columbia Public Schools under the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.) if
>
> (1) the hourly rate of compensation of the attorney exceeds the hourly rate of compensation under section 11–2604(a), District of Columbia Code [*i.e.*, $50 per hour], or
>
> (2) the maximum amount of compensation of the attorney exceeds the maximum amount of compensation under section 11–2604(b)(1), District of Columbia Code [*i.e.*, $1,300 total], except that compensation and reimbursement in excess of such maximum may be approved for

extended or complex representation in accordance with section 11–2604(c), District of Columbia Code.

Obviously, § 130 has some effect upon attorneys' fees under the IDEA. The question before us is what effect: Is § 130 a limitation for FY 1999 upon the court's pre-existing authority in § 615 to award attorneys' fees in excess of $50 per hour and $1,300 per case? Or does it merely "prohibit[ ] the District from paying during the same fiscal year" any fee the district court might award in excess of those caps, Maj. Op. at 9–10, thereby leaving the District liable for such awards after the end of that fiscal year? Today the court, citing an interpretive presumption and then declining to address the evidence offered by the District to overcome that presumption, gives the latter answer. I would give the former: § 130 limits the authority of the district court under IDEA § 615 because in § 130 the Congress "by clear implication, if not express statement, modified *pro tanto* the previous substantive law." *American Federation of Government Employees v. Campbell*, 659 F.2d 157, 161 (D.C.Cir.1980).

## II. Analysis

In *Campbell* this court held that an appropriations rider strikingly similar in text and structure to § 130 modified *pro tanto* the prior substantive statute to which it referred. There, the plaintiffs were federal employees whose wages were determined under the "prevailing rate statute," 5 U.S.C. §§ 5341–5349 (1976 & Supp. III 1979). That statute required that wages be "fixed and adjusted from time to time ... in accordance with prevailing rates," as determined by wage surveys of the private sector to be conducted by "lead agenc[ies]." *Id.* § 5343(a), (a)(3).

The lead agencies had conducted their surveys and recommended wage increases of between 7% and 12% for the plaintiffs. *See Campbell*, 659 F.2d at 159. Thus, the employing agencies were required by the prevailing rate statute to order pay raises

in this 7%–12% range (except insofar as they may have found the "public interest" required less—a point not relevant in *Campbell* or here). Before the employing agencies had actually ordered any wage increase, however, the Congress passed an appropriations rider that provided:

> No ... funds appropriated for the fiscal year [1979] ... may be used to pay the salary or pay of any individual ... in an amount which exceeds [a 5.5% raise] as a result of any adjustments which take effect during such fiscal year under ... (3) section 5343 of Title 5 ... if such adjustment is granted pursuant to a wage survey....

Pub.L. No. 95–429, § 614(a), 92 Stat. 1001, 1018 (1978). The Civil Service Commission interpreted the rider as prohibiting the employing agencies from granting any pay increase greater than 5.5%, and the agencies therefore ordered raises of only that percentage. *See Campbell*, 659 F.2d at 159.

The plaintiffs argued to this court that the rider did not modify the prevailing rate statute, and therefore the employing agencies were still required by law to order pay raises in the 7%–12% range recommended by the lead agencies. *See id.* at 160. We rejected this argument and concluded that for the fiscal year the appropriations rider modified the prevailing rate statute, limiting the plaintiffs' salary increase below the amount that would have been called for under that statute. We reached this conclusion based exclusively upon two elements in the text of the rider, which we accepted as clearly and unequivocally demonstrating that the Congress meant to and did modify the preexisting statute.

First, the appropriations rider expressly referred to the prevailing rate statute. It was upon precisely this basis that we distinguished *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), upon which the court relies today, as well as *United States v. Langston*, 118 U.S. 389, 21 Ct.Cl. 506, 6

S.Ct. 1185, 30 L.Ed. 164 (1886), which is to like effect. *See Campbell*, 659 F.2d at 160–61 & n. 9. The importance of an express reference to the preexisting statute is that it ensures that Members of Congress were aware that the new legislation would affect the operation of the preexisting statute. *See United States v. Hansen*, 772 F.2d 940, 944–45 (D.C.Cir. 1985). The Supreme Court had previously recognized the importance of such a reference (or lack thereof) in *TVA v. Hill* itself, *see* 437 U.S. at 189, 98 S.Ct. 2279, and two of our sister circuits have since done so, *see United States v. Joya–Martinez*, 947 F.2d 1141, 1144 (4th Cir.1991); *Republic Airlines, Inc. v. United States Dep't of Transp.*, 849 F.2d 1315, 1322 (10th Cir. 1988). *But compare Firebaugh Canal Co. v. United States*, 203 F.3d 568, 576 n. 4 (9th Cir.2000) (express reference "not [ ] meaningful"), *with id.* at 579 (Trott, J., dissenting) (express reference crucial).

Second, in *Campbell* we noted that the Congress had "specifically set a ceiling on wage increases" in the appropriations rider, which differentiated the rider from a "mere failure to appropriate funds." 659 F.2d at 161 n. 10. We distinguished *New York Airways, Inc. v. United States*, 177 Ct.Cl. 800, 369 F.2d 743 (Ct.Cl.1966), upon this basis. Again, the Supreme Court had already drawn the same distinction: The mere act of appropriating funds, *see TVA v. Hill*, 437 U.S. at 190, 98 S.Ct. 2279, or of failing to do so, *see Langston*, 118 U.S. at 394, 6 S.Ct. 1185, says little about the underlying substantive obligation; but inclusion in an appropriations act of a new framework to govern the substantive obligation indicates that the Congress was modifying the prior statutory framework, *see, e.g., United States v. Mitchell*, 109 U.S. 146, 149–50, 19 Ct.Cl. 703, 3 S.Ct. 151, 27 L.Ed. 887 (1883). Therefore we concluded that because the "Congress specifically set a ceiling on wage increases, and directly referred to the prevailing rate statute as one of the substantive statutes affected by the appropriations bill," the appropriations rider "contains words that by clear implication, if not express statement, modified *pro tanto* the previous substantive law." *Campbell*, 659 F.2d at 161 & n. 10.

In § 130 we see the same two textual elements that were dispositive in *Campbell*: It expressly refers to "the fees of an attorney who represents a party who prevails in an action ... under the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.)," and it lays out a comprehensive new framework for determining fees. As to the second textual element, this case is an even stronger one than *Campbell*: Where the appropriations rider in *Campbell* simply set a cap on wage increases, § 130 not only sets caps on attorneys' fees but also incorporates a detailed procedure by which a court may, under specified conditions, waive a cap. Section 130 thus "contains words that by clear implication, if not express statement, modif[y] *pro tanto* the previous substantive law." *Campbell*, 659 F.2d at 161.*

This conclusion drawn directly from the text of § 130 is also reflected in the legis-

---

* That § 130 expressly limits only the "pay[ment]" of IDEA attorneys' fees raises the possibility—and indeed, as the court notes, the presumption—that the Congress meant to affect only the payment and not the award of such fees. The Supreme Court has long held, however, that the use of "payment" or a similar term in an appropriations act does not end a court's inquiry into congressional intent. *See United States v. Dickerson*, 310 U.S. 554, 561–62, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940) ("deny[ing] that such words [prohibiting only payment during a particular fiscal year] when used in an appropriation bill are words of art or have a settled meaning"

sufficient to end the court's inquiry into congressional intent).

Both the Supreme Court and this court have found that appropriations riders that by their express terms limit or prohibit only payment may nonetheless alter the underlying substantive obligation and not just its payment. *See United States v. Will*, 449 U.S. 200, 205–08, 223–24, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980); *Campbell*, 659 F.2d at 159 n. 6; *City of Los Angeles v. Adams*, 556 F.2d 40, 46 (D.C.Cir.1977); *see also Tayloe v. Kjaer*, 171 F.2d 343, 344 (D.C.Cir.1948).

lative history of that provision. The District notes that the House Appropriations Committee, in the only report to discuss § 130 in any detail, stated that § 130 "limit[s] the *award* of attorney fees in special education cases." H.R.Rep. No. 105–670, at 50 (1998) (emphasis supplied) (discussing predecessor version of § 130 identical in relevant respects to enacted version). President Clinton agreed, both when he signed § 130 into law, *see Statement by President William J. Clinton upon Signing H.R. 4328,* 34 Weekly Comp. Pres. Docs. 2108, 2112 (Nov. 2, 1998) ("the Act also includes language that would cap the *award* of plaintiffs' attorneys' fees in [IDEA] cases"), and when he vetoed a bill containing essentially the same rider the following year, *see District of Columbia Appropriations Act, 2000—Veto Message,* 145 Cong. Rec. H8941, H8942 (Sept. 28, 1999) ("[FY 2000 provision identical in relevant part to § 130] would cap the *award* of plaintiffs' attorneys' fees in [IDEA] cases") (emphases supplied).

Finally, the District argues that the incongruous and plainly unintended results ensuing from the court's interpretation suggest that § 130 is a limitation upon the district court's authority to award attorneys' fees; common sense tells us the District is right. Otherwise, one would have to believe that the Congress intended awards of attorneys' fees above the caps to accumulate as IOUs, payable at the end of the fiscal year when the appropriations rider is no longer operative. Of course, the Congress does, not infrequently, decline to appropriate money for an undertaking authorized under prior law. In cases where the prior statute merely authorizes the undertaking, however, no obligation can lawfully be incurred until funds have been appropriated, *see* 31 U.S.C. 1341(a); the effect in such a case is to postpone until a later date any steps that actually cause the Government to incur an obligation. This case is entirely different: Under the court's interpretation of § 130, the District will continue to incur additional liabilities, which will continue to accumu-

late while its authority to pay them remains in suspense.

The court today does not point to any reason for thinking the Congress really intended such a peculiar result. (Nor, since they chose not to file a brief in the District's cross-appeal, do the cross-appellee families suggest any such reason; nor did the district court.) There are, to be sure, cases in which a court has held that the Congress delayed only the payment and not the underlying incurrence of an obligation, *see, e.g., Langston,* 118 U.S. at 394, 6 S.Ct. 1185; but these involve mere failures to appropriate a sufficient sum where there is no other indication the Congress intended that the Government not incur new liabilities, *see id.,* or there is specific legislative history demonstrating the Congress understood it was not altering the Government's underlying liability, *see New York Airways,* 369 F.2d at 751. Where, on the other hand, the Congress has done more than merely fail to appropriate a sum sufficient to cover an accumulating obligation, the Supreme Court has held that "it is not to be believed that Congress ... was simply appropriating a part of that which it knew was due." *Belknap v. United States,* 150 U.S. 588, 595, 29 Ct.Cl. 557, 14 S.Ct. 183, 37 L.Ed. 1191 (1893); *see also Will,* 449 U.S. at 224, 101 S.Ct. 471 ("Congress intended to rescind [Adjustment Act] raises entirely, not simply to consign them to the fiscal limbo of an account due but not payable"); *cf. National Treasury Employees Union v. Devine,* 733 F.2d 114, 120 (D.C.Cir.1984) (rejecting interpretation of appropriations resolution that would have resulted in "steady accumulation of unreviewed proposals").

As the District points out in its brief, the result of the court's interpretation of § 130 is in fact more than just peculiar—it accomplishes the exact opposite of what the Congress sought to achieve through § 130. Most IDEA complaints filed with the District are resolved in an administrative pro-

ceeding before the D.C. school system, that is, without resort to the district court. Before § 130 was enacted, the District had adopted guidelines under which, as required by the IDEA, it would award and pay reasonable attorneys' fees in such cases upon the submission of a proper fee application; thus in FY 1998 the District, without any court involvement, approved and paid $10,400,000 in IDEA attorneys' fees for administrative proceedings; during the same year the District paid only $664,000 in fees awarded by the court. When § 130 became effective, however, the District revised its guidelines, in conformity therewith, to preclude any fee application that sought attorneys' fees above the caps. In other words, the District interpreted § 130 as limiting its authority to award as well as to pay attorneys' fees above the caps during FY 1999—an interpretation the court today necessarily accepts as correct in the way it tries to distinguish *Campbell*, Maj. Op. at 11.

Limiting awards by the District without limiting awards by the district court would actually increase the District's fee liability, however. A family that prevails in an administrative proceeding but is denied by the District a "reasonable" attorneys' fee because the amount exceeds the caps may simply repair to the district court for an award of fees greater than what the District can award, *see Moore v. District of Columbia*, 907 F.2d 165 (D.C.Cir.1990) (*en banc*); moreover, the district court may include in its uncapped award reasonable fees for the attorneys' fee litigation, *see Moore v. District of Columbia*, 674 F.Supp. 901 (D.D.C.1987) (awarding $29,357 for IDEA representation and $19,117 for representation in subsequent attorneys' fee litigation before the district court). Under the court's interpretation of § 130, therefore, the Congress not only failed effectively to cap the fees awarded

against the District, it managed to increase the District's fee liability—as well as the District's expenditures for its own legal representation—by requiring and enabling families to go to district court to obtain a higher award. I do not think that was what the legislature meant to do or did. *See Clinton v. New York*, 524 U.S. 417, 430, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (rejecting interpretation of statute that "would produce an absurd ... result which Congress could not have intended").

The court today reaches the contrary conclusion by way of the presumption that an appropriations act does not alter substantive law. Maj. Op. at 9, 9–10, 11. The Supreme Court has made clear, however, that a presumption used to interpret a statute is "just that—a presumption [which] may be overcome" by contrary evidence that provides a "reliable indicator of congressional intent." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). In keeping with this teaching, both the Supreme Court and this court have found appropriations acts to have modified preexisting substantive law in the light of evidence from the text, *see Campbell*, 659 F.2d at 160–61, from legislative history, *see, e.g., Will*, 449 U.S. at 224, 101 S.Ct. 471, or from the structure of the act, *see, e.g., Mitchell*, 109 U.S. at 149–50, 3 S.Ct. 151; and, yes, in the light of common sense as well, *see, e.g., Belknap*, 150 U.S. at 595, 14 S.Ct. 183; *Devine*, 733 F.2d at 120. The District has sought to overcome the presumption with evidence from all of these sources; but the court today, scarcely even acknowledging the District's arguments, relies upon "bare statement[s] of law" instead of evaluating the evidence to determine whether "the facts ... present a different picture of congressional intent." *Campbell*, 659 F.2d at 160.*

---

* For example, the court misreads the Supreme Court's decision in *TVA v. Hill* as barring us from considering the District's extensive and uncontested evidence regarding incongruous outcomes in order to determine what the

Congress most likely meant by § 130. Maj. Op. at 9–10. The portion of *TVA v. Hill* quoted by the court, however, Maj. Op. at 10, 9, merely states that after a court has determined what the Congress commanded in the

The greatest problem for the court is that no matter how it analyzes § 130 it runs into *Campbell*. As for the undoubted presumption against finding that an appropriations act effects a substantive modification of law, in *Campbell* we concluded unequivocally that the appropriations act repealed *pro tanto* the prevailing rate statute, and the presumption was overcome based upon only the two textual elements that are likewise present in § 130. As for the undoubted rule that repeal by implication is disfavored, even if we treat § 130 as an implied repealer—and I do not believe that either this case or *Campbell* involves an implied repealer as exemplified by the argument urged upon the Court in *TVA v. Hill*—the same two textual factors provide the "affirmative showing of an intent to repeal" required under *TVA v. Hill*, 437 U.S. at 190, 98 S.Ct. 2279.

The court today makes one attempt to distinguish *Campbell* from this case: In *Campbell* the employing agency both granted and paid any wage increase, whereas in this case the district court awards fees while the District pays them. Maj. Op. at 9, 11. That factoid, the court claims, poses a question in this case that was not present in *Campbell*: "in the absence of clear legislative intent ... to amend substantive law, does an appropriations act funding one governmental entity restrict the substantive authority of a separate entity, indeed a separate branch of government?" Maj. Op. at 11. Assuming counterfactually, as the question does, the absence of clear legislative intent, the answer would of course be no. In this case, however, we have the same evidence of legislative intent that we held sufficient in *Campbell* to show the Congress meant to modify substantive law. The real issue lurking in the court's rhetorical question, then, is not whether evidence of congressional intent is required but whether such evidence can ever show that an appropriations act funding one governmental entity is meant to restrict the substantive authority of another entity. As a pair of cases from this court demonstrates, the answer is yes, if that is what the Congress discernably meant the appropriations act to do.

In *Devine*, 733 F.2d at 114, the Office of Personnel Management had issued new personnel regulations less than a month before the Congress enacted an appropriations rider stating that "[n]one of the funds appropriated under this Act [funding the OPM] shall be obligated or expended to implement, promulgate, administer, or enforce the [new OPM regulations]." 733 F.2d at 116. Based upon the precise wording of the rider, the OPM took the position that the rider "does not prevent any agency other than OPM from implementing, administering and enforcing the regulations within that agency." *Id.* at 116–17. We rejected that argument for two reasons, both based expressly upon the intent of the legislature: first, the Congress did not intend personnel regulations to be applied by other agencies without the OPM's involvement; and second, "even assuming arguendo that the regulations could be implemented workably without further participation by the OPM, it is evident that Congress intended to prevent this." *Id.* at 119–20.

In *Donovan*, 734 F.2d at 1547, the respondent, who had been cited for a mine safety violation, argued that an appropriations rider prohibiting the Mine Safety and Health Administration (MSHA) from expending appropriated funds to "enforce any standard, rule, regulation or order under the ... Act" precluded the Government from appealing an adverse administrative ruling on the mine safety violation. 734 F.2d at 1557. We rejected that argu-

---

statute, it should not use its remedial discretion effectively to nullify that command by withholding a remedy based upon its own "appraisal of the wisdom or unwisdom of [the] particular course consciously selected by the Congress." *Id.* at 194. This rule certainly does not authorize, let alone require, this court to ignore the District's arguments about what the statute means in the first place.

ment, noting that the Office of the Solicitor of Labor, which conducted the appeal, was not funded by the MSHA appropriation. We did not stop at that observation, however; we went on to inquire into what the Congress intended to accomplish through the rider—as evidenced by the untoward consequences that would ensue if the appropriations rider were interpreted to amend the preexisting substantive law applicable to another entity:

> [The appropriations rider] was the beginning of an effort by some members of Congress to shift [certain mining] operations from MSHA to OSHA jurisdiction. That effort ultimately did not succeed and we think it would be wholly unreasonable to suppose that Congress intended a temporary suspension to wreak the procedural havoc with ongoing appeals that [petitioner] urges. We interpret [the rider] to indicate only Congress' intent that MSHA initiate no new enforcement litigation.

*Id.* at 1558. Thus, the court did not interpret the rider as doing anything more than limiting new enforcement actions by the MSHA because there was no indication that the Congress had the seemingly unreasonable intent to affect actions already in the hands of the Solicitor.

Although the results in *Devine* and *Donovan* look in different directions, they are not in conflict. Quite the contrary, the court in each case asked precisely the same question: Did the Congress intend an appropriations act that expressly places limits upon only one governmental entity to limit the authority of another governmental entity? In *Devine* the court said yes, while in *Donovan* the court (acting two weeks later through two of the same judges) said no. The question should be

the same here as well, and based upon the text of § 130 and the incongruities that will result from the contrary interpretation, I think the clear answer is that the Congress did intend § 130 to modify *pro tanto* § 615 of the IDEA.*

### III. Summary and Conclusion

The text of § 130 makes clear that the Congress modified for FY 1999 the authority of the district court to award attorneys' fees under § 615 of the IDEA, 20 U.S.C. § 1415. Even if § 130 is analyzed under the rubric of an implied repealer, the same text provides the clear and manifest "affirmative showing of an intention to [modify]" required under *TVA v. Hill,* 437 U.S. at 190, 98 S.Ct. 2279. I therefore dissent from Part III of the opinion for the Court and from the judgment in No. 99-5216.

---

\* The court finds *Devine* "distinguishable" on the ground that the legislative history was more clear in that case. Maj. Op. at 11–12. In other words, the court does not dispute that the Congress may limit the authority of an entity not specifically named in the statute; it seems to think, however, that the court must find a statement to that effect in the

legislative history in order for us so to conclude. I think it more appropriate to rely primarily upon the textual elements to which *Campbell* directs us—all the more confidently in view of the absurd results brought on by the contrary interpretation—and only secondarily upon legislative history.